UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                )
                                                )
UNITED STATES OF AMERICA          )
                                                )
v.                                             )                    No. 20-CR-10271
                                                )
DAVID DEQUATTRO,                       )
                        Defendant           )
                                                )
_____ )

## MOTION TO DISMISS

Now comes the defendant David DeQuattro, by and through undersigned counsel, and, pursuant to Fed. R. Crim. P. 12, hereby respectfully moves this Honorable Court to dismiss Counts 1, 4, and 5 of the Indictment in the above-captioned matter.  As grounds and reasons therefor, Mr. DeQuattro states that the facts set forth in the Indictment, accepted as true for purposes of this Motion to Dismiss, are legally insufficient to support a conviction under 18 U.S.C. § 666 or to support a conviction under 18 U.S.C. § 371 for conspiring to violate 18 U.S.C. § 666.  As further grounds and reasons for his Motion, Mr. DeQuattro incorporates the below Memorandum of Law.

## REQUEST FOR ORAL ARGUMENT

Mr. DeQuattro respectfully requests that oral argument be held on this Motion.

1

**MEMORANDUM OF LAW**

A.      **Background**[1]

        Mr. DeQuattro stands charged with two counts of federal program bribery, *see* 18 U.S.C.
§ 666, and one count of conspiracy to commit the same.  These charges stem from Mr.
DeQuattro's position as a shareholder, officer, and director at a Providence, Rhode Island
architecture firm identified only as the "Company."  *See* Dkt. 1 at ¶ 8.  Mr. DeQuattro was not
the President or Controller of the Company and did not have authority to direct payment of
Company funds.  *See id.* at ¶ 9.  On May 7, 2014, the Company entered into a contract with the
Gaming Authority of the Mashpee Wampanoag Tribe (hereinafter the "Tribe"), providing that
the Company would "serve as the 'owner's representative' for the Gaming Authority during both
the preconstruction and construction phases of [a] casino project."  *Id.* at ¶ 15.  Mr. DeQuattro's
co-defendant, Cedric Cromwell, was the Chairman of the Tribe, as well as one of five "voting
member[s]" and President of the Gaming Authority's Board of Directors.  *Id.* at ¶¶ 6, 12-13.

        The government alleges that the conspiracy's object was for Cromwell "to use his
position and influence as Chairman of the Tribe and President of the Gaming Authority to solicit
and accept payments and other things of value from the Company through [Mr. DeQuattro], in
exchange for favorable action or inaction on the Contract by the Gaming Authority, and for [Mr.
DeQuattro] to give money and other things of value from the Company to [Cromwell] in
exchange for favorable action or inaction on the Contract by the Gaming Authority."  *Id.* at ¶ 17.
The Indictment sets out a series of six checks, along with a Bowflex home gym and a hotel

---

[1] The below facts are taken from the Indictment and accepted as true only for purposes of this
Motion to Dismiss.  Mr. DeQuattro reserves the right to contest any and all of these facts at an
eventual trial in this matter.

reservation, provided by Mr. DeQuattro to Cromwell (through two different entities) between July 2014 and May 2017, all months or years after the contract between the Company and the Tribe was already in place. *See id.* at ¶ 19a. The payments by Mr. DeQuattro were allegedly made "under the pretext that they were donations to [Cromwell's] reelection campaign and/or charitable contributions." *Id.* at ¶ 19c.

The only action alleged to have been taken by Cromwell as an agent of the Tribe and/or the Gaming Authority is his signing checks issued by the Gaming Authority to the Company for amounts "invoiced under the Contract." *See, e.g.*, *id.* at ¶ 54. There is no suggestion that Mr. DeQuattro intended or anticipated any other action(s) by Cromwell. The Indictment identifies fourteen checks issued on March 27, 2015, January 29, 2016, April 22, 2016, May 20, 2016, June 24, 2016, August 5, 2016, September 9, 2016, October 7, 2016, November 18, 2016, January 20, 2017, March 31, 2017, May 26, 2017 (two checks), and August 18, 2017, respectively. Cromwell is said to have "signed" the first check and "cosigned" the other thirteen, presumably along with at least one other of the five Gaming Authority Board members. *Id.* at ¶¶ 54, 60-63, 68-71, 78-79, 84-86.

Any temporal connection between the checks provided by Mr. DeQuattro and those cosigned by Cromwell to the Company is questionable at best. Mr. DeQuattro provided checks on July 26, 2014, *id.* at ¶ 23, September 1, 2014, *id.* at ¶ 32, October 31, 2014, *id.* at ¶ 39, and January 6, 2015, *id.* at ¶ 48. Cromwell is not alleged to have signed any Gaming Authority check until March 27, 2015, about eight months after the first DeQuattro payment and more than two months after the last. *Id.* at ¶ 54. Mr. DeQuattro provided another check on November 13, 2015, *id.* at ¶ 56, but Cromwell is not alleged to have cosigned any additional checks until more

than two-and-a-half months later on January 29, 2016. *Id.* at ¶ 60. Cromwell allegedly cosigned

three more checks (without anything further provided by Mr. DeQuattro) over the ensuing five

months. *Id.* at ¶¶ 61-63. The Bowflex machine was allegedly provided to Cromwell on August

5, 2016. *Id.* at ¶ 67. Cromwell cosigned one check that day, but he cosigned three additional

checks (without anything further provided by Mr. DeQuattro) over the next three-and-a-half

months. *Id.* at ¶¶ 68-71. The last check was provided by Mr. DeQuattro on January 12, 2017.

*Id.* at ¶ 74. Cromwell cosigned one check about a week later (on January 20th), but cosigned

another check after more than two months without ever receiving anything else from Mr.

DeQuattro. *Id.* at ¶¶ 78-79. Finally, Mr. DeQuattro allegedly paid for a hotel reservation on

May 18, 2017. *Id.* at ¶ 83. Cromwell cosigned two checks about a week later (May 26th), but

cosigned another check after the passage of almost three months without any additional

purported consideration. *Id.* at ¶¶ 84-86. Although a "stream of benefits" or "ongoing course of

conduct" theory has been understood to relax the requirement that there be a close nexus

between a payment (the "*quid*") and an official act (the "*quo*"), there must nonetheless be an

"exchange for a pattern of official acts favorable to the donor." *United States v. Woodward*, No.

12-CV-11431, 2012 WL 4856055, at *7 (D. Mass. Oct. 10, 2012) (Woodlock, J.) (citation

omitted). The Indictment fails to specify a "pattern of official acts" or a pattern of acts

"favorable to the donor" that were "exchanged" for any payment.

      The Indictment fails to specifically allege that any of the payments influenced or was

intended to influence any vote by Cromwell in his capacity as a member of the Gaming

Authority or that he was paid with the intent to influence his exercise of authority in any way to

benefit Mr. DeQuattro or his Company. Although the Indictment generally alleges that the

payments were in exchange "for favorable action or inaction on the Contract by the Gaming Authority," there is no specific allegation that Cromwell ever influenced any action or inaction on the Contract nor that Mr. DeQuattro ever sought any specific official act that involved any "favorable action or inaction on the Contract"; to the contrary, the specific overt acts alleged indicate that Cromwell did no more than cosign (or on one occasion sign) checks to Mr. DeQuattro's Company, none of which were alleged to have resulted from any influence by Cromwell.  Here, there were no "official acts" favorable to the donor, only a series of ministerial acts that were required as flowing directly from the votes of the Gaming Authority's five-member Board to approve an invoice – votes that the Indictment does not allege were influenced by or intended to be influenced by any payment made by Mr. DeQuattro however the payment is characterized.  In short, the requirement of a *quid pro quo* exchange of a payment for official acts – the distinguishing fact that divides federally prohibited criminal bribes from payments that "may not be very different, except possibly in degree, from the . . . routine cultivation of friendship in a lobbying context," or in this case the business development context – is missing from all of the many specific allegations in the twenty-three-page Indictment.  *Woodward*, 2012 WL 4856055, at \*7 (quoting *United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996)).

**B.    Legal Standard**

"An indictment is ripe for dismissal if the facts" alleged by the government "demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense."  *United States v. Sidoo*, 468 F. Supp. 3d 428, 436 (D. Mass. 2020). Accordingly, a defendant may move to dismiss on the grounds that "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."

*United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (citation omitted); *see also United States v. Enmons*, 410 U.S. 396, 412 (1973) (affirming dismissal of indictment where statute did not prohibit the conduct charged).

Such a challenge to the indictment is not precluded by mere general allegations setting for the elements of the offense.  While such general allegations are necessary, they are not sufficient to withstand a motion to dismiss, at least where the specific factual allegations set forth in the charging document do not amount to a violation of the relevant statute.  *See United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (rejecting government argument "that an indictment . . . charges an offense . . . as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements"), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358, 410 (2010). In *Panarella*, the information charged that the defendant "knowingly and willingly assisted" another to avoid apprehension for honest services wire fraud.  *Id.* at 684.  The defendant failed to "point to any specific statutory language that the charging instrument omitted" and, indeed, the document "track[ed] the language of the relevant statutory provisions nearly word for word."  *Id.* In assessing the validity of the defendant's guilty plea, however, the Third Circuit did not stop there.  Instead, it proceeded to consider (but ultimately reject) the merits of the defendant's argument because "a charging document fails to state an offense if the specific facts alleged . . . fall beyond the scope of the relevant criminal statute."  *Id.* at 685; *see also United States v. Nosal*, No. 08-CR-0237, 2010 WL 934257, at *2 (N.D. Cal. Jan. 6, 2010) ("General conclusory allegations need not be credited . . . when they are belied by more specific allegations in the [indictment]." (citation omitted) (alteration in original)), *aff'd*, 676 F.3d 854 (9th Cir. 2012).

6

This analysis is part of the Court's "duty to review the Government's Indictment and confirm that a legally deficient charge does not go to the jury." *United States v. Pimenta*, No. 14-CR-649, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015) (dismissing charge because factual allegations failed to satisfy element of offense).

**C.     Argument**

i.     *Failure to allege quid pro quo*

Section 666 applies to a defendant who "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an . . . Indian tribal government . . . in connection with any business, transaction, or series of transactions of such . . . government . . . involving anything of value of $5,000 or more."  18 U.S.C. § 666(a)(2).

In *United States v. Bravo Fernandez*, 722 F.3d 1 (1st Cir. 2013), the First Circuit faced a circuit split regarding whether § 666 requires that *quid pro quo* bribery, as opposed to mere illegal gratuity, be alleged and proven.  The court, in determining that § 666 could not be satisfied by illegal gratuities, relied upon the Supreme Court's discussion of the distinctions between bribery and gratuities:

> The distinguishing feature of each crime is its intent element. Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act, while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act.  In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act.  An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), *or for a past act that he has already taken*.

*Id.* at 19 (quoting *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404-05

(1999)).  The *Bravo* court held that the statutory language of § 666 required that the payment be made "corruptly," a word also appearing in § 201's bribery subsection, and triggered the *quid pro quo* requirement.  *See id.* at 23-24.  It also cited the fact that § 666's maximum penalty of ten years made it "difficult to accept" an argument that it could apply to mere gratuities, punishable by only two years' imprisonment under § 201.  *See id.* at 24.  Finally, the structure of § 666 supported a reading that created a unitary bribery offense.  *See id.* at 24-25 ("We think it unlikely that Congress would condense two distinct offenses [bribery and gratuity] into the same subsection in § 666 when the statute upon which it is based [§ 201] has separate subsections for each offense.").

A *quid pro quo* exists "[w]hen a person with the power to do or not do something demands a payment from the beneficiary of the exercise of that power as a condition for continuing to do so."  *United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013).  While § 666 does not require that a contemplated bribe be successful, *see United States v. Colburn*, No. 19-CR-10080, 2020 WL 4341301, at *5 (D. Mass. July 28, 2020), the alleged "bribe-giver" must "intend[] to effect a *quid pro quo*," *United States v. O'Brien*, 994 F. Supp. 2d 167, 187 (D. Mass. 2014).

In the present case, the facts set forth in the Indictment, taken at face value, are insufficient as a matter of law to establish the *quid pro quo* required to support a conviction under § 666.  The only acts allegedly taken by Cromwell, or anticipated by Mr. DeQuattro, are Cromwell's signing (indeed, in all but one instance, "cosign[ing]") checks to the Company as payment for services due under the applicable contract.  There is no exercise of discretion or official "power," *see Gracie*, 731 F.3d at 3, subject to potential "influence" at play in this

8

context, *see United States v. McDonough*, 727 F.3d 143, 159 n.9 (1st Cir. 2013) (stating, in the context of honest services fraud, that *quid pro quo* bribery requires a payment made "with the specific purpose of influencing [the official's] actions on official matters" (quoting *United States v. Urciuoli*, 613 F.3d 11, 18 (1st Cir. 2010) (alteration in original)).

The Indictment fails to allege that Mr. DeQuattro's campaign contributions, *see* Dkt. 1 at ¶ 19c, were made with the intent to influence Cromwell's performance of this purely ministerial duty.[2]  The contract between the Company and the Gaming Authority was already in place more than two-and-a-half months before the Indictment alleges anything of value was provided by Mr. DeQuattro.  The absence of a *quid pro quo* is further reinforced by the lack of meaningful connection between the checks and other benefits allegedly provided by Mr. DeQuattro to Cromwell and the ensuing checks to the Company cosigned by Cromwell.  In many instances, the alleged *quid* and *quo* are separated by several intervening months.

The Indictment's allusion to a "stream of payments" theory does not relieve the government of its obligation to allege, and ultimately prove, an actionable *quid pro quo* and to satisfy the official act requirement (discussed in more detail below).  While it is true that "[b]ribery can be accomplished through an ongoing course of conduct," the alleged bribe must still be provided "in exchange for a pattern of official acts favorable to the donor."  *Woodward v. United States*, 905 F.3d 40, 46 (1st Cir. 2018) (first emphasis and alteration in original) (quoting *McDonough*, 727 F.3d at 154); *see also Woodward*, 2012 WL 4856055, at *7 (same).  Here, for

---

[2] Indeed, the defense anticipates the evidence will show that invoices submitted by the Company were subjected to a full review by the funding source of the casino project (Genting) and the Tribe Treasurer before being reviewed and approved by the five-member Gaming Authority Board.  Upon approval, the invoices were required to be paid.  Cromwell, therefore, exercised no discretion whatsoever in signing or cosigning the checks.

the reasons explained above, the Indictment falls short of this standard.  The mere fact that Cromwell took the ministerial action of cosigning checks to Mr. DeQuattro's Company for amounts due under its contract with the Tribe some time after receiving campaign contributions from Mr. DeQuattro stands in sharp contrast to the facts of cases in which the First Circuit has affirmed convictions on a stream of benefits theory.  *See Woodward*, 905 F.3d at 42 (state representative "actively supported the [insurance] industry's position" on bills while receiving "in excess of $9,000 in gratuities" from insurance lobbyists); *McDonough*, 727 F.3d at 154-55 (in exchange for payment former Speaker of the House contacted Department of Education Commissioner regarding award of lucrative state contract and later about funding the project).

     ii.     *Failure to satisfy heightened standard for campaign contributions*

Special considerations merit a heightened standard in cases involving campaign contributions to elected officials.  As the Supreme Court has explained, "[m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done."  *McCormick v. United States*, 500 U.S. 257, 272 (1991).  To interpret federal criminal statutes to apply to such conduct "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation."  *Id.* at 272.  While *McCormick* involved a prosecution under the Hobbs Act, the concerns expressed by the Court are readily applicable to a § 666 charge, like those at issue here, predicated upon campaign contributions.  In this context, to avoid vagueness concerns and encroachment upon state or tribal sovereignty, the government should be required to allege, and ultimately prove,

that the payments at issue were "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273.

Certainly, the Indictment provides no hint of the explicit *quid pro quo* required under *McCormick*. This heightened standard applies given the allegation that Cromwell solicited payments from Mr. DeQuattro "under the pretext that they were donations to his reelection campaign and/or charitable contributions." Dkt. 1 at ¶ 19c. It is no answer to conclusorily assert that Mr. DeQuattro knew the payments "were neither donations to [Cromwell's] reelection campaign nor charitable contributions." *Id.* Indeed, in *McCormick* itself, the Court rejected a similar argument that the payments at issue "were never intended to be *legitimate* campaign contributions." 500 U.S. at 271 (citation omitted). Notwithstanding such protestations, in order to trigger federal criminal law, a campaign contribution must be "made in return for an explicit promise or undertaking." *Id.* at 273. Here, the Indictment references no explicit agreement or understanding whatsoever between Mr. DeQuattro and Cromwell.

       iii.    *Failure to allege official act*

For similar reasons, the Indictment fails to sufficiently allege the existence of any requisite official act taken by Cromwell in exchange for the payments he received. The Supreme Court has held that the federal bribery statute's reference to an "official act," *see* 18 U.S.C. § 201, requires that the public official in question "make a decision or take an action on [a] 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016). The matter at issue "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," which must also "be something specific and

11

focused that is 'pending' or 'may by law be brought' before a public official." *Id.* "'Pending'
and 'may by law be brought' suggest something that is relatively circumscribed—the kind of
thing that can be put on an agenda, tracked for progress, and then checked off as complete.  In
particular, 'may *by law* be brought' conveys something within the specific duties of an official's
position—the function conferred by the authority of his office." *Id.* at 2369.  Not every
"favorable action or inaction" by a public official will suffice.  *See* Dkt. 1 at ¶ 17; *Woodward*,
905 F.3d at 45 (discussing Second Circuit opinion holding that definition of official act to
include "any action taken or to be taken under color of official authority" did not comport with
*McDonnell* (citing *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017)).  "[A] typical meeting,
telephone call, or event arranged by a public official," for example, is not an official act.
*McDonnell*, 136 S. Ct. at 2368.

     While § 666 does not expressly include the term "official act," the First Circuit has
recognized that this section is closely related to § 201.  *See Bravo*, 722 F.3d at 20 (referring to
§ 666 as the "stepchild" of § 201 (citation omitted)).  As noted above, the *Bravo* court relied
heavily on the relationship between these two statutes to hold that § 666 requires *quid pro quo*
bribery.  In doing so, the First Circuit repeatedly used the term "official act" to describe the
requisite *quo* that must be provided or expected in exchange for payment (or *quid*).  *See, e.g.*, *id.*
at 23 (explaining in reference to § 666's use of the word "reward," that the "*offer* of payment"
must "precede[] the official act").  The applicability of § 201's official act requirement in this
context is also consistent with *Bravo*'s observations regarding the Congressional intent
underlying § 666.  As the First Circuit explained, the enactment of the latter statute was
"[s]purred by the Supreme Court's pending consideration of the meaning of § 201 in *Dixson v.*

*United States*, 465 U.S. 482 (1984), which sought to resolve whether § 201 applied to state and local officials." *Id.* at 21.  The legislative history indicates that § 666 was intended to "augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program." *Id.* (citing S. Rep. No. 98–225, at 369 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510).  In extending federal bribery law to this context, nothing in the legislative history suggests that Congress wished to subject state and local officials to criminal liability for a broader array of conduct than their federal counterparts.

In addition to the close relation between the two statutes, the concerns motivating the Supreme Court's restrictive reading of "official act" in § 201 are equally applicable to § 666. Absent this requirement, the offense lacks "sufficient definiteness that ordinary people can understand what conduct is prohibited" and opens the door to "arbitrary and discriminatory enforcement." *McDonnell*, 136 S. Ct. at 2373 (quoting *Skilling*, 561 U.S. at 402-03).  Under an uncabined reading of the statute, "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions," raising "serious" Due Process concerns. *Id.*  There are also federalism interests served by a narrow interpretation.  "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349 (1971).  "This principle applies when Congress intends to pre-empt the historic powers of the States or when it legislates in traditionally sensitive areas that affec[t] the federal balance." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543 (2002) (citation omitted) (alteration in original).  "A State defines itself as a sovereign through the structure of its government, and the character of those who exercise government authority.  That

13

includes the prerogative to regulate the permissible scope of interactions between state officials

and their constituents." *McDonnell*, 136 S. Ct. at 2373 (citation omitted).  Federal bribery

statutes should not be construed "in a manner that leaves [their] outer boundaries ambiguous and

involves the Federal Government in setting standards of good government for local and state

officials." *Id.* (citation omitted).  These considerations apply with equal force to sovereign

Native American tribes.

The Indictment at issue here, on its face, fails to charge that Cromwell engaged in any

"official act," or that Mr. DeQuattro intended for him to engage in any such act, in exchange for

any payment or benefit provided by Mr. DeQuattro.  This fact alone warrants dismissal.

"Indictments must 'contain[] the elements of the offense charged and fairly inform[] a defendant

of the charge against which he must defend . . . .'" *United States v. Johnson*, 981 F.3d 1171,

1179 (11th Cir. 2020) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974) (alterations in

original)).  Under *McDonnell* and *Bravo*, in order to sustain a conviction under § 666, the

government is required to prove an "official act" by the public official receiving the alleged bribe

or, the corollary, an "official act" in exchange for which the payor was intending to influence

with the payment.  That term appears nowhere in the Indictment in this case.  The mere fact that

the Indictment "track[s] statutory language" does not insulate it from challenge where the

charging document fails to include an element held by judicial precedent to be required for

conviction.  *See id.* at 1179-80.

The specific facts set forth in the Indictment are also insufficient to satisfy the official act

requirement.  The sum total of the government's allegations is that Mr. DeQuattro provided

benefits, usually in the form of "pretext[ual]" campaign contributions, to Cromwell, Chairman of

a federally recognized Native American Tribe, in exchange for his cosigning checks as payment for amounts due to Mr. DeQuattro's Company under the applicable contract.  There is no indication that Cromwell exercised any discretion in his performance of this "merely ministerial" duty, *see Woodward*, 905 F.3d at 47 (citation omitted), that his signature was even necessary given the existence of several other Gaming Authority Board members, or that he did anything else to further the interests of Mr. DeQuattro or his Company.  This conduct is markedly distinct from other actions by public officials found to constitute official acts.  *See id.* at 45 ("Requiring a tie to the 'enactment of legislation' . . . seems to substantially satisfy *McDonnell*'s definition of 'official act.'" (citation omitted)); *United States v. Woodward*, No. 17-CV-12036, 2017 WL 4684000, at *6 (D. Mass. Oct. 18, 2017) (Woodlock, J.) ("Leading the opposition to a major piece of legislation plainly qualifies as an 'official act' under *McDonnell*.  So too would the many instances where [the defendant] 'carried' pro-insurance bills through the legislative process after they left the committee." (citation omitted)); *cf. United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (finding official act requirement under state gratuity statute not satisfied where the evidence failed to show that a state representative "subsequently introduced a bill based on either of [the defendant's] proposals or took some official act with respect to such a bill proposed by another legislator").  The Indictment here fails to allege that Cromwell made any "decision" at all, much less engaged in a "formal exercise of governmental power" as required under *McDonnell*.  *See* 136 S. Ct. at 2372.  If cosigning a check for payment of a legitimate government debt is enough to trigger the statute, virtually every conceivable action by a public official could give rise to criminal liability.  The Court should interpret the statute in a manner that avoids such "a sweeping expansion of federal criminal jurisdiction."  *Cleveland v. United*

15

*States*, 531 U.S. 12, 24 (2000); *see also United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017)

(unpublished) (finding instruction regarding "official act" requirement in § 666 case deficient

under *McDonnell*).[3]

**D.      Conclusion**

For the foregoing reasons, the specific facts alleged in the Indictment are insufficient as a

matter of law to support a conviction under § 666.  Accordingly, Mr. DeQuattro respectfully

requests that the Court dismiss Counts 1, 4, and 5.

<u>**COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**</u>

Undersigned counsel conferred with the Government, and the Government opposes the

relief requested in this Motion.

> Respectfully Submitted,
> DAVID DEQUATTRO
> By His Attorney,
>
> <u>**/s/ Martin G. Weinberg**</u>
> Martin G. Weinberg, Esq.
> Mass. Bar No. 519480
> 20 Park Plaza, Suite 1000
> Boston, MA 02116
> (617) 227-3700
> owlmgw@att.net

Dated: January 19, 2021

---

[3] Mr. DeQuattro acknowledges that other jurisdictions have declined to apply *McDonnell* to § 666.  *See, e.g.*, *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017).  The defense, however, respectfully submits that those decisions failed to afford sufficient weight to the close relationship between § 201 and § 666, as well as the substantial Due Process and federalism concerns raised by a broad interpretation of the latter statute.  The First Circuit disagreed with some of these same jurisdictions in *Bravo* when it held that § 666 requires *quid pro quo* bribery.  *See, e.g.*, *United States v. Abbey*, 560 F.3d 513, 521 (6th Cir. 2009) ("We agree with the Second Circuit that *Sun–Diamond*'s heightened quid pro quo standard is inapplicable to . . . 18 U.S.C. § 666." (citing *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007)).

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, January 19, 2021, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.