UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v.                                              )     Criminal No. 20-10271-DPW<br>)<br>(1) CEDRIC CROMWELL and      )<br>(2) DAVID DEQUATTRO,         )<br>)<br>     Defendants                 ) | |

**UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS COUNTS 1-5 OF THE INDICTMENT**

Defendant David DeQuattro has moved to dismiss all three counts asserted against him: one count of Conspiracy to Commit Federal Programs Bribery, 18 U.S.C. § 666, in violation of 18 U.S.C. § 371 (Count One), and two substantive counts of Federal Programs Bribery (Counts Four and Five). Doc. No. 34. Defendant Cedric Cromwell has also moved to dismiss Count One, as well as the two substantive counts of Federal Programs Bribery asserted against him (Counts Two and Three). Cromwell has not filed a separate memorandum of law. Instead, his motion incorporates by reference the arguments raised in DeQuattro's memorandum of law. Doc. No. 35.

The United States respectfully requests that the Court reject all three arguments raised by the defendants. First, the indictment alleges a quid pro quo. Second, the heightened quid pro quo requirement from *McCormick v. United States* does not apply here but would be satisfied even if it did. And third, assuming arguendo that the "official act" requirement set forth in *McDonnell v. United States* applies to cases brought under 18 U.S.C. § 666, it is satisfied here.

**FACTS ALLEGED IN THE INDICTMENT**

In 2014-2018, Cromwell was the elected Chairman of the Mashpee Wampanoag Tribe (the "Tribe"), a federally recognized Indian Tribe that received federal grants totaling more than $10,000 annually. Ind. ¶¶ 3-7. DeQuattro was a licensed architect and a shareholder, officer, and director of an architecture and design firm identified in the indictment as the "Company." Ind. ¶ 8. An unindicted co-conspirator identified in the indictment as the "Company President" was authorized to direct the payment of Company funds, including for employee payroll purposes. Ind. ¶ 9.

The Tribe voted to build and operate a resort and casino. Ind. ¶ 10. The entity responsible for all aspects of the casino project, including hiring and firing consultants, was a Tribe subsidiary called the Mashpee Wampanoag Gaming Authority (the "Gaming Authority"). Ind. ¶¶ 11, 14. The Gaming Authority operated through a five-member board of directors, of which Cromwell was the President. Ind. ¶¶ 12-13.

The Gaming Authority and the Company entered into a consulting agreement dated May 7, 2014, for the Company to serve as the owner's representative for the casino project (the "Contract"). Ind. ¶ 15. The Contract did not have a termination date. It provided that either party could terminate the Contract for cause with seven days' notice, or for any reason with one month's notice. Ind. ¶ 16.

The Company, through DeQuattro, provided Cromwell with a stream of benefits worth $57,549.37 that Cromwell solicited from DeQuattro and to which Cromwell was not entitled: five $10,000 payments, one $4,000 payment, a used Bowflex home gym valued at $1,700, and a weekend hotel stay for which the Company paid $1,849.37. Ind. ¶¶ 19(a), 19(c), 21-28, 31-35,

38-42, 45-51, 55-57, 64-67, 72-75, 80-83. Cromwell began soliciting these bribes not long after the Contract was signed, and continued to solicit them for almost three years. Ind. ¶¶ 21, 80.

Cromwell, DeQuattro, and the Company President conspired to conceal the bribes. In regard to the six payments totaling $54,000, Cromwell and DeQuattro agreed to disguise the identity of the payer by using checks written on DeQuattro's personal account instead of Company checks. Ind. ¶¶ 19(d), 19(g), 23, 32, 39, 48, 56, 74. DeQuattro and the Company President agreed that the Company would reimburse DeQuattro, and that they would disguise the reimbursement payments by characterizing them as employee bonuses or single-paycheck salary increases and recording them on the Company's books as payroll expenses. Ind. ¶ 19(e), 19(j), 29-30, 36-37, 43-44, 52-53, 58-59, 76-77. Cromwell and DeQuattro conspired to conceal the fact that Cromwell was the recipient of the payments by using an intermediary called CM International Consulting LLC, a company owned by a friend of Cromwell's identified in the indictment as "Friend A," or, in one case, by DeQuattro directly paying a shell entity that Cromwell owned called One Nation Development LLC. Ind. ¶¶ 19(b), 19(f)-(g), 22-23, 32-33, 39-40, 45-46, 48-49, 55-57, 74-75. To further conceal the nature and source of the payments, Cromwell directed Friend A not to pay him with CM International checks, but, instead, to buy anonymous treasurer's checks payable to Cromwell or One Nation Development. Ind. ¶¶ 19(h)-(i), 24-28, 34-35, 41-42, 50-51.

In exchange for this stream of payments and in-kind benefits, Cromwell agreed to exercise his influence as the Chairman of the Tribe and President of the Gaming Authority's board of directors to ensure that the board did not terminate the Contract. Ind. ¶ 17. And in fact, the Contract was not terminated. Between July 18, 2014, and February 15, 2018, the Company received almost $5 million under the Contract. Ind. ¶ 19(a). The payments included fourteen

Gaming Authority checks signed or cosigned by Cromwell, including one check that Cromwell signed the very day that DeQuattro delivered the Bowflex gym to Cromwell's house. Ind. ¶¶ 54, 60-63, 68-71, 78-79, 84-86.

Count One of the indictment charges Cromwell and DeQuattro with conspiring to violate 18 U.S.C. § 666 in violation of 18 U.S.C. § 371.

In Counts Two and Three, Cromwell is charged with soliciting and accepting bribes worth over $5,000, intending to be influenced in his role as Chairman of the Tribe and President of the Gaming Authority, with regard to the Contract, in violation of 18 U.S.C. § 666(a)(1)(B). Ind. ¶¶ 89-90. The bribe alleged in Count Two is a $10,000 check that DeQuattro wrote to One Nation Development at Cromwell's request. Ind. ¶ 56. The stream-of-payments bribe alleged in Count Three is the Bowflex gym, the $4,000 check, and the weekend hotel stay, all of which Cromwell solicited within a one-year period and whose total value exceeded $5,000. Ind. ¶¶ 67, 74, 83.

In Counts Four and Five, DeQuattro is charged with paying bribes worth over $5,000, intending to influence Cromwell in his role as Chairman of the Tribe and President of the Gaming Authority, with regard to the Contract, in violation of 18 U.S.C. § 666(a)(2). Ind. ¶¶ 91-92. The bribes alleged in Counts Four and Five against DeQuattro are the same bribes alleged in Counts Two and Three against Cromwell.

## STANDARD OF REVIEW

"The indictment's allegations are assumed to be true." *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014). The issue for the Court is "not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." *United States v. Brissette*, 919 F.3d

4

670, 675 (1st Cir. 2019) (citation and internal quotation marks omitted). The defendants' motions must fail if they can "prepare a defense and plead double jeopardy in any future prosecution for the same offense." *United States v. Rodriguez-Rivera*, 918 F.3d 32, 34 (1st Cir. 2019) (citation and internal quotation marks omitted).

## ARGUMENT

The defendants make three arguments in support of dismissal. None has merit.

**1. The Indictment Alleges a Quid Pro Quo**

The defendants argue that the indictment fails to allege a quid pro quo. Doc. No. 34 at 7-10. They are wrong. The quid was the stream of payments and in-kind benefits provided by DeQuattro, and the quo was Cromwell's agreement to use his influence as Chairman of the Tribe and President of the Gaming Authority's board of directors to ensure that the board did not terminate the Contract. *See* Ind. ¶ 17 (DeQuattro paid the bribes in exchange for Cromwell's agreement to "use his position and influence as Chairman of the Tribe and President of the Gaming Authority . . . [to effect] favorable action *or inaction* on the Contract by the Gaming Authority") (emphasis added).

When given in exchange for payment, an official's promise to make something not happen is just as criminal as a promise to make something happen. "'[A] public official may not demand payment as inducement for the promise to perform (*or not to perform*) an official act.'" *McCormick v. United States*, 500 U.S. 257, 273 (1991) (quoting *United States v. Dozier*, 672 F.2d 531, 537 (5th Cir. 1982) (emphasis added)); *accord United States v. Gracie*, 731 F.3d 1, 3 (1st Cir. 2013) ("When a person with the power to do *or not do* something demands a payment from the beneficiary of the exercise of that power as a condition for continuing to do so, the payment is [a bribe].") (emphasis added); *United States v. Silver*, 948 F.3d 538, 549 (2d Cir.

5

2020) ("What matters is that the official manifested a willingness to take payment for official action *or inaction*.") (emphasis added), *petition for cert. docketed*, No. 20-60 (U.S. July 23, 2020); *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011) (same); *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) (same).

### 2. The Indictment Is Not Dismissible Under *McCormick*

The defendants next argue that the indictment fails to meet the heightened quid pro quo standard articulated in *McCormick v. United States*, 500 U.S. 257 (1991). Doc. No. 34 at 10-11.

The defendant in *McCormick* was a state legislator who accepted a campaign contribution from a group of doctors shortly before sponsoring legislation that supported the doctors. A jury convicted the defendant of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951. The Supreme Court overturned the conviction. It recognized that not every contribution to a politician's campaign made around the time the politician supports legislation benefiting the donor is necessarily corrupt; politicians often support legislation benefiting constituents, and "campaigns must be run and financed." *McCormick*, 500 U.S. at 274. Therefore, in the context of a campaign contribution, the standard of proof for a bribe is higher. Specifically, a political candidate's receipt of a campaign contribution constitutes extortion under color of official right only if the payment is made "in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273 (emphasis added). "In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *Id.*; *see United States v. Cruzado-Laureano*, 404 F.3d 470, 482 (1st Cir. 2005) (describing this requirement as a "specific" quid pro quo).[1]

---

[1] The quid pro quo must be *explicit*, but it need not be *express*. "The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods." *Evans v. United States*, 504 U.S. 255, 274 (1992)

6

The government is unaware of any appellate decision in any circuit examining whether *McCormick* extends to cases brought under 18 U.S.C. § 666. Assuming for the sake of argument that it does, there are three reasons why the defendants' position lacks merit.

First, *McCormick* does not apply here because the indictment does not allege that DeQuattro's payments to Cromwell were campaign contributions. On the contrary, it alleges that DeQuattro's payments were not campaign contributions and he knew it. Ind. ¶ 19(c).[2] Although not required, the indictment cites facts supporting this allegation. For example, DeQuattro paid Cromwell $50,000 between July 2014 and November 2015, even though Cromwell was not up for reelection until 2017. Ind. ¶¶ 6 21, 23, 31-32, 38-39, 47-48, 55-56. In addition, DeQuattro did not pay Cromwell or a Cromwell campaign account. Instead, he wrote out checks to an entity called CM International Consulting LLC. Ind. ¶ 19(f).

Second, even if *McCormick* did apply, the heightened quid pro quo standard is an evidentiary requirement, not a pleading requirement. *See, e.g., United States v. Allinson*, Crim. No. R 17-390-2, 2017 WL 11351040, at *1 n.1 (E.D. Pa. Dec. 7, 2017) ("Whether the acts alleged in the Indictment in fact satisfy the meaning of an explicit quid pro quo under *McCormick*, . . . [is a] factual determination[] to be resolved after the Government has presented

---

(Kennedy, J., concurring). Nor must the agreement be proved with direct evidence. "[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions." *United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988).

[2] If DeQuattro argues at trial that he genuinely believed the payments were campaign contributions, the jury will be required to examine the evidence relevant to his intent. *See McCormick*, 500 U.S. at 271 (if there is a question "whether payments made to an elected official are in fact campaign contributions, . . . the intention of the parties is a relevant consideration in pursuing this inquiry"). Matters of intent, of course, are for the jury to decide. *Id.* at 270.

evidence at trial."). The heightened standard applies only if the defendant's payment was, in fact, a political contribution. Where, as here, that issue is disputed, it must be resolved by a jury. *See supra* n.2. Only if the jury finds that the defendant's payment was a political contribution must it then determine whether the government has proved an explicit quid pro quo.

Third, even if *McCormick* did apply in this case and was relevant at the pleadings stage, it would be met here. The indictment alleges a specific quid pro quo: DeQuattro paid Cromwell in exchange for Cromwell's agreement to use his influence as Chairman of the Tribe and President of the Gaming Authority's board of directors to ensure the board did not terminate the Contract. Ind. ¶ 17.

### 3. The Indictment Alleges an Official Act

According to the defendants, the indictment does not allege that DeQuattro paid Cromwell with intent to influence an "official act," or that Cromwell solicited and accepted the payments with intent to be influenced in the performance of an "official act," a term used in 18 U.S.C. § 201. Doc. No. 34 at 11-16. The Supreme Court has held that an "official act" as used in Section 201 means something more than setting up a meeting, talking to another official, or organizing an event. *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016).

Section 666, unlike Section 201, does not use the term "official act." The First Circuit has not yet examined whether *McDonnell* applies in Section 666 cases. Every circuit court to have decided the issue has held that it does not. *Winfield v. U.S. Probation & Pretrial Servs.*, 810 F. App'x 343, 344 (5th Cir. 2020), *cert. denied*, 2021 WL 78222 (U.S. Jan. 11, 2021); *United States v. Ng Lap Seng*, 934 F.3d 110, 130 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 161 (2020); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018); *see also United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (expressing doubt that *McDonnell* extends to Section 666).

However, assuming for the sake of argument that *McDonnell* applies in Section 666 cases, the requirement is met here. The indictment alleges that DeQuattro paid Cromwell in exchange for Cromwell's agreement to use his influence as Chairman of the Tribe and President of the Gaming Authority's board of directors to ensure the board did not vote to terminate the Contract. Ind. ¶ 17. Voting to terminate or not terminate the Contract was an official act.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court deny the defendants' motions to dismiss Counts One through Five of the indictment.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:  */s/ Christine Wichers*
      CHRISTINE WICHERS
      Assistant U.S. Attorney

## Certificate of Service

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 25, 2021.

        */s/ Christine Wichers*
        Christine Wichers