UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | No. 20-CR-10271 |
| CEDRIC CROMWELL, <br> Defendant | ) ) ) ) ) | |

### **DEFENDANT CEDRIC CROMWELL'S MOTION TO DISMISS COUNTS 6-10**

Now comes the defendant Cedric Cromwell, by and through undersigned counsel, and, pursuant to Fed. R. Crim. P. 12, hereby respectfully moves this Honorable Court to dismiss Counts 6, 7, 8, 9, and 10 of the Indictment in the above-captioned matter. As grounds and reasons therefor, Mr. Cromwell states that the facts set forth in the Indictment, accepted as true for purposes of this Motion to Dismiss, are legally insufficient to support a conviction under 18 U.S.C. § 1951 or to support a conviction under 18 U.S.C. § 371 for conspiring to violate 18 U.S.C. § 1951. As further grounds and reasons for his Motion, Mr. Cromwell incorporates the below Memorandum of Law.

In the alternative, should the Court deny this Motion to Dismiss, Mr. Cromwell requests the Court order the government to provide him with a bill of particulars for Counts 6, 7, 8, 9 and 10 of the Indictment, delineating (1) the time, place, manner and means by which contributions were received by Mr. Cromwell with the knowledge that they were in exchange for an official act, (2) delineating the time, place, manner and means by which Mr. Cromwell implicitly agreed to perform an official act in exchange for contributions, (3) delineating the time, place, manner and means of the performance by Mr. Cromwell of an official act in exchange for contributions,

1

(4) delineating the time, place manner and means by which an explicit quid pro quo was expressed or understood between Mr. Cromwell and Mr. DeQuattro, (5) delineating the time, place, manner and means by which Mr. Cromwell communicated an explicit promise to Mr. DeQuattro to perform or not to perform an official act, or undertook to perform or not perform an official act.

## REQUEST FOR ORAL ARGUMENT

Mr. Cromwell respectfully requests that oral argument be held on this Motion.

## MEMORANDUM OF LAW

A.  **Background**[1]

Mr. Cromwell stands charged with four counts of extortion, *see* 18 U.S.C. § 1951, and one count of conspiracy to commit the same, as well as two counts of aiding and abetting bribery concerning programs receiving federal funds, *see* 18 U.S.C. § 666, and one count of conspiracy to commit federal programs bribery. This Motion relates only to the four counts of extortion and one count of conspiracy to commit the same, as Mr. Cromwell has previously motioned to dismiss the other counts. See Dkt. 34. The charges stem from Mr. Cromwell's position as Chairman of the Mashpee Wampanoag Tribe (hereinafter the "Tribe") and as one of five "voting member[s]" and President of the Board of Directors of the Tribe's Gaming Authority. Dkt. 1 at ¶¶ 6, 12-13. On May 7, 2014, the Tribe entered into a contract with a Providence, Rhode Island architecture firm identified only as the "Company." Dkt. 1 at ¶ 8. The contract provided that the Company would "serve as the 'owner's representative' for the Gaming Authority during both the preconstruction and construction phases of [a] casino project." *Id.* at ¶ 15. Mr. Cromwell's co-

---

[1] The below facts are taken from the Indictment and accepted as true only for purposes of this Motion to Dismiss. These facts are substantially similar to those contained in Mr. DeQuattro's Motion to Dismiss, and are repeated herein because of the similar arguments asserted by each defendant. Mr. Cromwell reserves the right to contest any and all of these facts at an eventual trial in this matter.

2

defendant, David DeQuattro, was a shareholder, officer, and director at the Company. *See* Dkt. 1 at ¶ 8.

The government alleges that the conspiracy's object was for Cromwell "to use his position and influence as Chairman of the Tribe and President of the Gaming Authority to obtain property not due to him, from the Company, with the consent of [Mr. DeQuattro] and the Company President, in exchange for favorable action or inaction on the Contract by the Gaming Authority. The purpose of the conspiracy was for [Mr. Cromwell] to enrich himself purposefully." *Id.* at ¶ 18. The Indictment sets out a series of six checks, along with a Bowflex home gym and a hotel reservation, provided by Mr. DeQuattro to Cromwell (through two different entities) between July 2014 and May 2017, all months or years after the contract between the Company and the Tribe was already in place. *See id.* at ¶ 19a. The payments by Mr. DeQuattro were allegedly made "under the pretext that they were donations to [Cromwell's] reelection campaign and/or charitable contributions." *Id.* at ¶ 19c.

The only action alleged to have been taken by Cromwell as an agent of the Tribe and/or the Gaming Authority is his signing checks issued by the Gaming Authority to the Company for amounts "invoiced under the Contract." *See, e.g.*, *id.* at ¶ 54. There is no suggestion that Mr. DeQuattro intended or anticipated any other action(s) by Cromwell. The Indictment identifies fourteen checks issued on March 27, 2015, January 29, 2016, April 22, 2016, May 20, 2016, June 24, 2016, August 5, 2016, September 9, 2016, October 7, 2016, November 18, 2016, January 20, 2017, March 31, 2017, May 26, 2017 (two checks), and August 18, 2017, respectively. Cromwell is said to have "signed" the first check and "cosigned" the other thirteen, presumably along with at least one other of the five Gaming Authority Board members. *Id.* at ¶¶ 54, 60-63, 68-71, 78-79, 84-86.

3

Any temporal connection between the checks provided by Mr. DeQuattro and those cosigned by Cromwell to the Company is questionable at best. Mr. DeQuattro provided checks on July 26, 2014, *id.* at ¶ 23, September 1, 2014, *id.* at ¶ 32, October 31, 2014, *id.* at ¶ 39, and January 6, 2015, *id.* at ¶ 48. Cromwell is not alleged to have signed any Gaming Authority check until March 27, 2015, about eight months after the first DeQuattro payment and more than two months after the last. *Id.* at ¶ 54. Mr. DeQuattro provided another check on November 13, 2015, *id.* at ¶ 56, but Cromwell is not alleged to have cosigned any additional checks until more than two-and-a-half months later on January 29, 2016. *Id.* at ¶ 60. Cromwell allegedly cosigned three more checks (without anything further provided by Mr. DeQuattro) over the ensuing five months. *Id.* at ¶¶ 61-63. The Bowflex machine was allegedly provided to Cromwell on August 5, 2016. *Id.* at ¶ 67. Cromwell cosigned one check that day, but he cosigned three additional checks (without anything further provided by Mr. DeQuattro) over the next three-and-a-half months. *Id.* at ¶¶ 68-71. The last check was provided by Mr. DeQuattro on January 12, 2017. *Id.* at ¶ 74. Cromwell cosigned one check about a week later (on January 20th), but cosigned another check after more than two months without ever receiving anything else from Mr. DeQuattro. *Id.* at ¶¶ 78-79. Finally, Mr. DeQuattro allegedly paid for a hotel reservation on May 18, 2017. *Id.* at ¶ 83. Cromwell cosigned two checks about a week later (May 26th), but cosigned another check after the passage of almost three months without any additional purported consideration. *Id.* at ¶¶ 84-86. Although a "stream of benefits" or "ongoing course of conduct" theory has been understood to relax the requirement that there be a close nexus between a payment (the "*quid*") and an official act (the "*quo*"), there must nonetheless be an "exchange for a pattern of official acts favorable to the donor." *United States v. Woodward*, No. 12-CV-11431, 2012 WL 4856055, at *7 (D. Mass. Oct. 10, 2012) (Woodlock, J.) (citation omitted). The Indictment fails to specify a

4

"pattern of official acts" or a pattern of acts "favorable to the donor" that were "exchanged" for any payment.

The Indictment fails to specifically allege that any of the payments were made in exchange for any vote by Cromwell in his capacity as a member of the Gaming Authority or in exchange for his exercise of authority in any way to benefit Mr. DeQuattro or his Company. Although the Indictment generally alleges that the payments were in exchange "for favorable action or inaction on the Contract by the Gaming Authority," there is no specific allegation that Cromwell ever influenced any action or inaction on the Contract nor that Mr. DeQuattro expected or ever sought any specific official act that involved any "favorable action or inaction on the Contract"; to the contrary, the specific overt acts alleged indicate that Cromwell did no more than cosign (or on one occasion sign) checks to Mr. DeQuattro's Company, none of which were alleged to have resulted from any influence by Cromwell. Here, there were no "official acts" favorable to the donor, only a series of ministerial acts that were required as flowing directly from the votes of the Gaming Authority's five-member Board to approve an invoice—votes that the Indictment does not allege were cast in exchange for any payment made by Mr. DeQuattro, regardless of how the payment is characterized. In short, the requirement that a defendant know that a payment received was made in exchange for official acts, which transforms a mere gratuity into extortion under color of official right, is missing from all of the many specific allegations in the twenty-three-page Indictment.

**B.      Legal Standard**

"An indictment is ripe for dismissal if the facts" alleged by the government "demonstrate that, as a matter of law, the prosecution will not be able to prove each of the elements of the charged offense." *United States v. Sidoo*, 468 F. Supp. 3d 428, 436 (D. Mass. 2020).

5

Accordingly, a defendant may move to dismiss on the grounds that "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (citation omitted); *see also United States v. Enmons*, 410 U.S. 396, 412 (1973) (affirming dismissal of indictment where statute did not prohibit the conduct charged).

Such a challenge to the indictment is not precluded by mere general allegations setting for the elements of the offense. While such general allegations are necessary, they are not sufficient to withstand a motion to dismiss, at least where the specific factual allegations set forth in the charging document do not amount to a violation of the relevant statute. *See United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (rejecting government argument "that an indictment . . . charges an offense . . . as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements"), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358, 410 (2010). In *Panarella*, the information charged that the defendant "knowingly and willingly assisted" another to avoid apprehension for honest services wire fraud. *Id.* at 684. The defendant failed to "point to any specific statutory language that the charging instrument omitted" and, indeed, the document "track[ed] the language of the relevant statutory provisions nearly word for word." *Id.* In assessing the validity of the defendant's guilty plea, however, the Third Circuit did not stop there. Instead, it proceeded to consider (but ultimately reject) the merits of the defendant's argument because "a charging document fails to state an offense if the specific facts alleged . . . fall beyond the scope of the relevant criminal statute." *Id.* at 685; *see also United States v. Nosal*, No. 08-CR-0237, 2010 WL 934257, at *2 (N.D. Cal. Jan. 6, 2010) ("General conclusory allegations need not be credited . . . when they are belied by more specific allegations in the

6

[indictment]." (citation omitted) (alteration in original)), *aff'd*, 676 F.3d 854 (9th Cir. 2012). This analysis is part of the Court's "duty to review the Government's Indictment and confirm that a legally deficient charge does not go to the jury." *United States v. Pimenta*, No. 14-CR-649, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015) (dismissing charge because factual allegations failed to satisfy element of offense).

**C.  Argument**

  i.  *Failure to allege knowledge that payments were made for official acts*

Section 1951 applies to a defendant who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery extortion or attempts or conspires so to do." 18 U.S.C. 1951(a). The section defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."18 U.S.C. 1951(b)(2). In *Evans v. United States*, 504 U.S. 255 (1992), the Supreme Court clarified the elements of the crime of extortion under color of official right. In rejecting the argument that the crime required the public official to affirmatively act to induce payment, an issue over which circuit courts had split, the Court held that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268. Following the precedents of several other circuits, the First Circuit has assumed, without deciding, that *Evans* requires an implicit *quid pro quo* is necessary for conviction for extortion under color of official right. *See United States v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012) ("The *Evans* Court did not directly state that proof of at least an implicit, as opposed to an explicit, quid pro quo or reciprocity understanding is necessary. However, both Justice Kennedy in a concurrence and three other justices in a dissent recognized that the *Evans* majority's

7

opinion pointed toward such a requirement."). Under *Evans*, mere acceptance of a payment by a public official is not enough to support a conviction. What might otherwise be considered a gratuity, legal or illegal, is considered a payment extorted under color of official right only if the public official who receives the payment knows that it was offered in exchange for official acts and implicitly agrees to perform them.

The facts set forth in the Indictment in the present case, taken at face value, are insufficient as a matter of law to establish that the payments were made in exchange for any official acts, much less that Mr. Crowell knew that the payments were made in exchange for any official acts or implicitly agreed to perform them; consequently, they are insufficient as a matter of law to support a conviction under § 1951(b)(2). The Indictment alleges that contributions were made by Mr. DeQuattro to Mr. Cromwell, but it does not allege an official act in exchange for which they were made. The contract between the Company and the Gaming Authority was already in place more than two-and-a-half months before the Indictment alleges anything of value was provided by Mr. DeQuattro. The only alleged acts taken by Mr. Cromwell were his cosigning (and in one instance, signing) of checks to the Company as payment due under the applicable contract; however, there is no allegation that contributions were made to Mr. Cromwell in exchange for his performance of this routine ministerial duty. Indeed, the lack of meaningful temporal connection between alleged contributions made to Mr. Cromwell and alleged payments to the Company indicates that the contributions were not made for such a purpose.

  ii. *Failure to satisfy the heightened pleading standard for campaign contributions*

When an extortion under color of official right case involves a campaign contribution, there is a heightened standard that requires an explicit *quid pro quo* as part of the crime. *See*

8

*McCormick v. United States*, 500 U.S. 257, 273 (1991). In *McCormick*, a state legislator received several thousand dollars from doctors before sponsoring a bill favorable to the doctors, and additional money from the doctors after the bill's successful passage. The state legislator claimed that the payments were campaign contributions, and were therefore not extorted under color of official right within the meaning of the Hobbs Act. *See id.* at 259–260. The Supreme Court held that a campaign contribution could violate the Hobbs Act, "but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 268–69. In applying this rule, the First Circuit has stated that "where the payment *takes the form* of a campaign contribution, the government must prove a 'specific quid pro quo' between the public official and the payor." *United States v. D'Amico*, 496 F.3d 95, 101 (1st Cir. 2007) (emphasis added), *cert. granted, judgment vacated on other grounds*, 552 U.S. 1173 (2008).

*McCormick*'s explicit *quid pro quo* requirement applies to counts 7 and 9 in the present case because the Government alleges that Mr. DeQuattro made payments to Mr. Cromwell "under the pretext that they were donations to his reelection campaign and/or charitable contributions." Dkt. 1 at ¶ 19c. More specifically, for the check at issue in count 7, the Government alleges that Mr. Cromwell sent Mr. DeQuattro "an email, attaching an unsigned letter that was not on letterhead. It stated: 'Dear Dave, One Development will use the $10,000 donation for Political Action Committee food towards food, campaigns and elections.'" Dkt. 1 at ¶ 55. And for the check at issue in count 9, the Government alleges that a friend of Mr. Cromwell's texted Mr. DeQuattro: "Below is the name of the pizza place in case you need it for the fundraiser…" Dkt. 1 at ¶ 72. The same friend allegedly later added: "Another option is the [sic] cut the check to the following company[:] CM International LLC…. Note: Chairman Cedric

Cromwell Campaign." Dkt. 1 at ¶ 73. Given that the facts laid out by the Government indicate that these two payments were made as campaign contributions, or at the very least took the form of campaign contributions, the *McCormick* standard should apply. It is no answer to conclusorily assert that Mr. DeQuattro knew the payments "were neither donations to [Cromwell's] reelection campaign nor charitable contributions." *Id.* Indeed, in *McCormick* itself, the Court rejected a similar argument that the payments at issue "were never intended to be legitimate campaign contributions." 500 U.S. at 271 (citation omitted).

The Indictment falls fall short of the standard established in *McCormick*. It fails to allege any explicit promise or undertaking by Mr. Crowell to perform or not to perform an official act. The Government cannot rectify that failing by listing in the Indictment the dates on which Mr. DeQuattro made contributions to Mr. Cromwell and on which Mr. Cromwell cosigned or signed checks to the Company, because "[i]n the absence of such an agreement on a specific action, even a close-in-time relationship between the donation and the act will not suffice." *United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011). Nor can it rectify that failing through the bare assertion that Mr. Cromwell received contributions from Mr. DeQuattro "in exchange for favorable action or inaction on the Contract by the Gaming Authority," *see* Dkt. 1 at ¶ 17, a statement that lacks sufficient specificity to satisfy *McCormick*. *See United States v. Menendez*, 132 F. Supp. 3d 635, 644 (D.N.J. 2015) (dismissing counts alleging that a donor made contributions "in order to influence [a public official]'s official acts, as opportunities arose" because it was "an allegation of a 'generalized expectation of some future favorable action' barred by *McCormick*."). Nowhere do the facts alleged in the Indictment suggest the existence of an explicit agreement to perform or not perform an official act.

The Government argues, in its opposition to Mr. Cromwell and Mr. DeQuattro's motion to dismiss counts 1-5 of the Indictment, that the *McCormick* standard is an evidentiary requirement and not a pleading requirement, citing to *United States v. Allinson*, 2017 WL 11351040 (E.D. Pa. Dec. 7, 2017). *See* Dkt. 36 at 7. In *Allinson*, however, the court *did* consider whether the prosecution had adequately alleged a *quid pro quo*, and found that it had. *See United Allinson* at *1 n.1 ("the Court finds a *quid pro quo* between Allinson and Pawlowski has been adequately alleged."). Other courts have also characterized the standard as a pleading requirement. *See, e.g.*, *Menendez*, 132 F. Supp. 3d at 641 ("Counts 9–12 do not meet the heightened pleading standard required by *McCormick*."); *Cobbs v. Sheahan*, 319 F. Supp. 2d 865, 871 (N.D. Ill. 2004) ("When a plaintiff seeks to show extortion by a defendant in connection with seeking campaign contributions, she must *allege* an explicit quid pro quo—a threat or promise accompanying the demand for funds.") (emphasis added). These courts were correct to characterize the *McCormick* standard as a pleading requirement, because for cases involving a campaign contribution, *McCormick* announces an *element* of the crime of extortion under color of official right: an explicit *quid pro quo*. The Indictment fails to allege facts sufficient to meet that heightened pleading standard for counts 7 and 9.

    iii.    *Failure to allege an official act*

Even assuming for the sake of argument that the Indictment alleges that payments were made in exchange for acts, it fails to allege that those acts were "official acts" as required by *Evans*. Not every action taken by a public official constitutes an "official act" for the purposes of extortion under color of official right. The Supreme Court has held that the federal bribery statute's reference to an "official act," *see* 18 U.S.C. § 201, requires that the public official in question "make a decision or take an action on [a] 'question, matter, cause, suit, proceeding or

11

controversy,' or agree to do so." *McDonnell v. United States*, 136 S. Ct. 2355, 2372 (2016). The matter at issue "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," which must also "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. In particular, 'may by law be brought' conveys something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* at 2369. Not every "favorable action or inaction" by a public official will suffice. *See* Dkt. 1 at ¶ 17; *Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018) (discussing Second Circuit opinion holding that definition of official act to include "any action taken or to be taken under color of official authority" did not comport with *McDonnell* (citing *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017)). "[A] typical meeting, telephone call, or event arranged by a public official," for example, is not an official act. *McDonnell*, 136 S. Ct. at 2368.

While the term "official act" does not appear in §1951, the case law has made clear it is an element of the crime of extortion under color of official right, and much of the reasoning behind *McDonnell's* interpretation of § 201 applies with equal force to the portions of § 1951 that criminalize extortion under color of official right. In fact, the parties in *McDonnell* had agreed that they would use the definition of "official act" found in § 201 to define "official action" for the purposes of extortion under § 1951, and so the opinion's reading of "official act" led it to vacate convictions for extortion under color of official right. *See id.* at 2365. The concerns motivating the Court's reading of "official act" in § 201 are equally applicable to § 1951. Absent this requirement, the offense lacks "sufficient definiteness that ordinary people can

understand what conduct is prohibited" and opens the door to "arbitrary and discriminatory enforcement." *McDonnell*, 136 S. Ct. at 2373 (quoting *Skilling*, 561 U.S. at 402-03). Under an uncabined reading of the statute, "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions," raising "serious" Due Process concerns. *Id.* There are also federalism interests served by a narrow interpretation. "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349 (1971). "This principle applies when Congress intends to pre-empt the historic powers of the States or when it legislates in traditionally sensitive areas that affec[t] the federal balance." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543 (2002) (citation omitted) (alteration in original). "A State defines itself as a sovereign through the structure of its government, and the character of those who exercise government authority. That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell*, 136 S. Ct. at 2373 (citation omitted). Federal extortion statutes should not be construed "in a manner that leaves [their] outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." *Id.* (citation omitted). These considerations apply with equal force to sovereign Native American tribes.

The Indictment at issue here, on its face, fails to charge that Cromwell engaged in any "official act," or that Mr. Cromwell knew that any payments were made in exchange for "official acts." This fact alone warrants dismissal. "Indictments must 'contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend . . . .'" *United States v. Johnson*, 981 F.3d 1171, 1179 (11th Cir. 2020) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974) (alterations in original)). The mere fact that the Indictment

"track[s] statutory language" does not insulate it from challenge where the charging document fails to include an element held by judicial precedent to be required for conviction. *See id.* at 1179-80. Under *McDonnell*, in order to sustain a conviction under § 1951, the Government is required to prove that the public official who receives a payment knows that the payment was made in exchange for an "official act." That term appears nowhere in the Indictment in this case.

The specific facts set forth in the Indictment are also insufficient to satisfy the official act requirement. The sum total of the government's allegations is that Mr. DeQuattro provided benefits, usually in the form of "pretext[ual]" campaign contributions, to Cromwell, Chairman of a federally recognized Native American Tribe, in exchange for his cosigning checks as payment for amounts due to Mr. DeQuattro's Company under the applicable contract. There is no indication that Cromwell exercised any discretion in his performance of this "merely ministerial" duty, *see Woodward*, 905 F.3d at 47 (citation omitted), that his signature was even necessary given the existence of several other Gaming Authority Board members, or that he did anything else to further the interests of Mr. DeQuattro or his Company. This conduct is markedly distinct from other actions by public officials found to constitute official acts. See *id.* at 45 ("Requiring a tie to the 'enactment of legislation' . . . seems to substantially satisfy *McDonnell's* definition of 'official act.'" (citation omitted)); *United States v. Woodward*, No. 17-CV-12036, 2017 WL 4684000, at *6 (D. Mass. Oct. 18, 2017) (Woodlock, J.) ("Leading the opposition to a major piece of legislation plainly qualifies as an 'official act' under *McDonnell.* So too would the many instances where [the defendant] 'carried' pro-insurance bills through the legislative process after they left the committee." (citation omitted)); *cf. United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (finding official act requirement under state gratuity statute not satisfied where the evidence failed to show that a state representative "subsequently introduced a bill based on either

14

of [the defendant's] proposals or took some official act with respect to such a bill proposed by another legislator"). The Indictment here fails to allege that Cromwell made any "decision" at all, much less engaged in a "formal exercise of governmental power" as required under *McDonnell*. *See* 136 S. Ct. at 2372. If cosigning a check for payment of a legitimate government debt is enough to trigger the statute, virtually every conceivable action by a public official could give rise to criminal liability. The Court should interpret the statute in a manner that avoids such "a sweeping expansion of federal criminal jurisdiction." *Cleveland v. United States*, 531 U.S. 12, 24 (2000); see also *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) (unpublished) (finding instruction regarding "official act" requirement in § 666 case deficient under *McDonnell*).

The bare assertion that Mr. Cromwell received contributions from Mr. DeQuattro "in exchange for favorable action or inaction on the Contract by the Gaming Authority" is also insufficient to satisfy the official act requirement. Dkt. 1 at ¶ 17. The Government utterly fails to indicate the kinds of action or inaction to which this assertion might refer, or when the opportunity for taking such action or inaction might arise, which leaves the assertion too vague to satisfy *McDonnell*'s requirement that an "official act" involve a matter that is "specific or focused." *McDonnell*, 136 S. Ct. at 2372; *see also United States v. Silver*, 948 F.3d 538, 552–53 (2d Cir. 2020), *cert. denied*, No. 20-60, 2021 WL 231549 (U.S. Jan. 25, 2021) ("a public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action on a *particular* question or matter as the opportunity to influence that same question or matter arises.") (emphasis added). In its opposition to Mr. Cromwell and Mr. DeQuattro's motion to dismiss counts 1-5 of the Indictment, the Government does offer greater specificity, alleging that Mr. DeQuattro made

payments to Mr. Cromwell in exchange for Mr. Cromwell's "agreement to use his influence as Chairman of the Tribe and President of the Gaming Authority's board of directors to ensure that the board did not terminate the Contract." *See* Dkt. 36 at 5. By relying on this new theory now, the Government only underscores that the Indictment—and its vague reference to "favorable action or inaction on the Contract," *see* Dkt. 1 at ¶ 17—did not allege an official act and was therefore insufficient as a matter of law to support a conviction for extortion under color of official right under § 1951.

### D.   Conclusion

For the foregoing reasons, the specific facts alleged in the Indictment are insufficient as a matter of law to support a conviction under § 1951. Accordingly, Mr. Cromwell respectfully requests that the Court dismiss Counts 6, 7, 8, 9, and 10. In the alternative, Mr. Cromwell requests that the Court order the Government to produce a bill of particulars.

WHEREFORE, Cromwell requests that the Court allow this Motion.

### COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Undersigned counsel conferred with the Government, and the Government opposes the relief requested in this Motion.

Respectfully Submitted<br>
CEDRIC CROMWELL<br>
By His Attorney,<br>
<br>
_____<br>
Timothy R. Flaherty<br>
FLAHERTY LAW OFFICES<br>
699 Boylston Street, 12th Floor<br>
Boston, MA 02116<br>
(617) 227-1800<br>
BBO # 557477

Dated: February 4, 2021

## CERTIFICATE OF SERVICE

I hereby certify that the above document was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ Timothy R. Flaherty<br>
Timothy R. Flaherty