UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 20-CR-10271 |
| ) | |
| CEDRIC CROMWELL, ) | |
| Defendant ) | |

### DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO DISMISS

Now comes the defendant Cedric Cromwell, by and through undersigned counsel, and hereby respectfully submits this Reply to the Government's Opposition to his Motion to Dismiss.

In its argument against dismissal, the Government retreats from the theory advanced not in the Indictment, but in its earlier Opposition to Mr. Dequattro's motion to dismiss—a theory according to which Mr. Cromwell received payments in exchange for his "agreement to use his influence as Chairman of the Tribe and President of the Gaming Authority's board of directors to ensure that the board did not terminate the Contract." Dkt. 36 at 5. Its retreat from this theory is an implicit concession that the theory was not raised in the Indictment and therefore cannot forestall dismissal. Instead, the Government turns to vague language that was included in the Indictment and claims that Mr. Cromwell received the payments "in exchange for favorable action or inaction on the Contract by the Gaming Authority." Dkt. 1 at ¶ 18. In light of defendants' filings casting substantial doubt on the legal sufficiency of its previously proffered theories, the government attempts to salvage the Indictment by raising its allegations to a high level of abstraction. But, having chosen to set forth a detailed factual predicate in the charging document, the government may not now retreat from those facts. *See* Dkt. 35 at 5-7.

1

The Government also attempts to put a new (but no less vague) gloss on this "favorable action or inaction on the Contract" theory, characterizing it as an agreement by Mr. Cromwell to "use of his position and influence to protect the Contract." Dkt. 50 at 7. The Indictment itself, however, makes no mention of "protecting" the Contract and offers no indication of why or when it might have needed protection. Whatever gloss the Government puts on it, this theory of is inadequate to prevent dismissal. As outlined in detail in Mr. Cromwell's original motion, the Indictment fails to allege an official act, fails to allege that Mr. Cromwell knew the payments were made in exchange for an official act, and, for counts 7 and 9, fails to meet the heightened standard articulated in *McCormick v. United States*, 500 U.S. 257 (1991), which requires the Government to allege an explicit *quid pro quo*.

The Government argues that "ensuring favorable action or inaction on the Contract" was clearly an official act, but the cases which it cites to support this statement stand in stark contrast to the present case. In *Cordaro v. United States* a county official communicated through an intermediary that if an engineering firm made payments to him, the firm was guaranteed to keep its contract, and if it did not pay, it would probably lose its contract. *See Cordaro v. United States*, 933 F.3d 232, 236 (3d Cir. 2019). The county official made similar representations himself. *See id*. at 242 ("At their first meeting, Cordaro told McLaine that he would 'let [Acker Associates] keep that [existing work],' but 'if we're having fundraisers you're going to have to participate and support us.' And when McLaine was worried about losing the watershed-project contract, Cordaro asked Hughes whether McLaine would pay 'to keep his work.'") (internal citations omitted). The county official also took specific actions to benefit the firms that paid him, including seeing that a competitor's contract was cancelled so that one of the firms could have more work, taking a prominent role in contract negotiations with one of the firms, and

ensuring that one of the firms kept its full contract when it appeared a competitor might take over a portion of it. *See id*. at 242–43.

Thus, unlike the present case, *Cordaro* did not involve unspecified future action or action on a contract. To the contrary, it involved quite specific, direct action on a contract: The engineering firms feared that their contracts were facing imminent cancellation or reduction in scope, either due to the statements of competitors or the implicit threats of the defendant, and the defendant agreed to and did step in and ensure that their contracts were preserved or expanded. There is no such specificity in the present case—no indication that the Contract was threatened, that it was at risk of being cancelled or amended, or that any action related to the Contract was pending or imminent, and no indication that Mr. Cromwell agreed to preserve the Contract or took any direct action on the Contract. Preventing the cancellation of an at-risk contract may well constitute an official act, but the Indictment does not allege that the Contract was at risk or that payments were made to prevent its cancellation. *Cordaro* bears little similarity to the present case.

*United States v. Repak* and *Woodward v. United States* are also clearly distinct from the present case. In *Repak*, the Third Circuit held that the facilitation of the award of a contract was an official act under *McDonnell*. *See United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017). The Indictment here does not allege that payments were made to facilitate the award of a contract; nor could it, because the contract was awarded months before any payments were made. In *Woodward*, a state representative who co-chaired the Joint Committee on Insurance received payments from life insurance industry lobbyists. *See Woodward v. United States*, 905 F.3d 40, 42 (1st Cir. 2018). When a bill opposed by the industry was recommitted to the representative's committee, and thus required his action to advance, he prevented it from receiving a vote. *Id*. at 47. The First Circuit held that "actively preventing a vote to take place on a particular piece of proposed legislation falls well within

3

*McDonnell*'s definition of 'official acts.'" *Id*. at 48. The defendant in *Woodward* was faced with a very particular question—whether to allow a vote on a specific piece of legislation currently pending in his committee. Again, there is no such specificity to the allegations in the present case. The Indictment does not identify any possible vote on the Contract or any question related to the Contract that was up for consideration. Mr. Cromwell could not have actively prevented a vote on an unknown and unspecified question. In sum, the Government still cannot explain with any specificity what official act is alleged in the Indictment, and therefore the Indictment must be dismissed under *McDonnell*.

The Government also fails to allege that Mr. Cromwell knew the payments were made in exchange for an official act, or even to set out facts on the basis of which Mr. Cromwell might have deduced such a purpose. It argues in its Opposition that the Indictment alleges that Mr. Cromwell "obtained a stream of property items from the Company knowing they were not voluntarily given, but given with an expectation of receiving something in return: [Mr.] Cromwell's use of his position and influence to protect the Contract." Dkt. 50 at 7. This language referring to the "protection" of the Contract does not appear in the Indictment, and it does not clarify what official act was sought or how Mr. Cromwell was supposed to know it was sought. There is no allegation that the Contract was at risk or even that *any* question related to the Contract was up for consideration. Nor is there any allegation of communication between Mr. Cromwell and Mr. DeQuattro regarding the purpose of the payments. Absent such communication, and absent a context in which a question related to the Contract was up for consideration, Mr. Cromwell had no way of knowing or deducing the purposes (if any) for which Mr. DeQuattro made the payments.

The cases the Government cites to support its argument are distinguishable because they do not suffer from the same deficiency; in each one, there was either (1) communication related

4

to the purposes of the payment or (2) a specific and clearly pending matter on which the official could make a decision or exercise influence. Due to either the communication related to the payment or the context of a specific pending matter, the officials in these cases could discern that the payments or other benefits they received were made in exchange for official action. In *United States v. Turner*, the defendant received a payment in exchange for "his ongoing support using his city council position for [the payor's] as yet unsuccessful liquor license application." *United States v. Turner*, 684 F.3d 244, 256 (1st Cir. 2012). "[A]s [the payor] handed [the defendant] the $1,000, he said: 'after the hearing,' which was still to take place, 'I want to show my gratitude again.'" *Id*. at 258. In *United States v. Cruz-Arroyo*, the defendant received a payment from a health care company while that company's proposal to acquire a hospital was pending before the government agency in which the defendant was a high-ranking official. *See United States v. Cruz-Arroyo*, 461 F.3d 69, 74 (1st Cir. 2006). In *United States v. Lopez-Cotto*, a police officer received a variety of benefits "in exchange for using his position as a Lawrence patrolman to direct at least $5,000 worth of tows to [a tow company]." *United States v. Lopez-Cotto*, 884 F.3d 1, 8 (1st Cir. 2018). The officer proposed that he receive a discount on a vehicle and "then refer for towing at least 35 vehicles" and he also implicitly threatened to stop referring tows to the company unless it agreed to this arrangement. *Id*. at 5. This trio of cases—and the ease with which one can discern the specific official acts for which payments were made in each one—only reinforces the inadequacy of the allegations here, which do not reference a specific official act and do not include any communication or context that could enable Mr. Cromwell to discern that the payments were made in exchange for an official act.

      The Indictment also fails to meet the heightened standard required by *McCormick* for counts 7 and 9. The Government argues that *McCormick* is inapplicable "because the indictment

alleges DeQuattro's $10,000 check to One Nation Development and his $4,000 check to CM International Consulting LLC were not campaign contributions, and Cromwell and DeQuattro knew it." The Supreme Court created *McCormick*'s heightened standard so that ordinary political behavior, unavoidable in a system of privately funded election campaigns, would not be exposed to the overreach of prosecutors. *See McCormick*, 500 U.S. at 272. The Government cannot evade the *McCormick* requirement simply by asserting that payments that took the form of campaign contributions were not, in fact, campaign contributions. Allowing it to do so would jeopardize the important democratic and First Amendment interests that the Supreme Court sought to protect by creating the heightened standard in the first place. The Government must therefore allege an explicit *quid pro quo*. Notably, however, the Government's Opposition concedes that it is not an explicit *quid pro quo*—and thus not a Hobbs Act violation—to make political contributions "in order to influence" an elected representative's "official acts 'as opportunities arose,'" rather than seeking to influence "any specific official act." Dkt. 50 at 9-10 (citation omitted). The government's Opposition does not identify any "specific official act" that Mr. Cromwell allegedly took in exchange for payment. By the government's own logic, dismissal is appropriate on that basis. "[E]nsuring the Gaming Authority's favorable action or inaction on the Contract" does not, of course, constitute a specific official act. *Id*. at 10.

      The Government repeats its unavailing argument that *McCormick* creates an evidentiary requirement and not a pleading requirement. Federal courts, however, have treated the requirement as a pleading standard. *See United Allinson* at *1 n.1 ("the Court finds a *quid pro quo* between Allinson and Pawlowski has been adequately alleged."); *United States v. Menendez*, 132 F. Supp. 3d 635, 644 (D.N.J. 2015) ("Counts 9–12 do not meet the heightened pleading standard required by *McCormick*."); *Cobbs v. Sheahan*, 319 F. Supp. 2d 865, 871 (N.D. Ill.

6

2004) ("When a plaintiff seeks to show extortion by a defendant in connection with seeking campaign contributions, she must *allege* an explicit quid pro quo—a threat or promise accompanying the demand for funds.") (emphasis added).

The foregoing makes clear Mr. Cromwell's need for a bill of particulars in this case. Not only does the government's Opposition fail to identify the official act(s) underlying the charges against Mr. Cromwell, but, as noted above, the government's theory of liability has been a moving target, shifting each time defendants expose a deficiency in a previous iteration. For all the detail provided by the Indictment and discovery materials, Mr. Cromwell is unable to adequately prepare his defense without knowing, at minimum, (1) the specific official acts that the government alleges he took or agreed to take in exchange for payment, or (2) the time, place, manner, and means of the alleged explicit quid pro quo between Mr. Cromwell and Mr. DeQuattro. Given the government's evolving theory of this case, the Court should exercise its discretion to Order the bill of particulars outside the fourteen-day period following Indictment.

For the foregoing reasons, as well as those set forth in his initial Motion, Mr. Cromwell respectfully requests that the Court dismiss Counts 6, 7, 8, 9, and 10, or, alternatively, order the government to produce a bill of particulars.

Respectfully Submitted
CEDRIC CROMWELL
By His Attorney,

/s/ Timothy R. Flaherty
Timothy R. Flaherty
FLAHERTY LAW OFFICES
699 Boylston Street, 12th Floor
Boston, MA 02116
(617) 227-1800
BBO # 557477

Dated: February 25, 2021

7

**CERTIFICATE OF SERVICE**

I hereby certify that the above document was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ Timothy R. Flaherty
Timothy R. Flaherty