UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA </br></br> v. </br></br> DAVID DEQUATTRO, </br>　　　　　　Defendant | No. 20-CR-10271 </br> Leave to File Granted on </br> December 12, 2022 |

### DEFENDANT DAVID DEQUATTRO'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S BRIEF ON RESTITUTION

Now comes the defendant David DeQuattro, by and through undersigned counsel, and respectfully submits this Response in Opposition to the government's Brief on Restitution. In sum, the request for restitution, raised for the first time as a potential issue at the sentencing hearing, is woefully untimely and raises a host of intricate legal issues, which the government's brief fails to meaningfully address. This post-sentencing demand for almost a quarter million dollars from a defendant convicted of giving a tribal leader a used piece of gym equipment and a free hotel reservation is not supported by law or fact and should be rejected by this Court for all of the reasons set forth below.

**A.     The Request for Restitution is Untimely**

The restitution statute relied upon by the government provides that "not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution." 18 U.S.C. § 3664(d)(1). The Presentence

1

Report ("PSR") in this case prepared on September 29, 2022 and revised on October 27, 2022 expressly stated, "[r]estitution is not applicable in this case." It further stated that the case involved "no identifiable victim." Neither the government nor the Tribe, which was presumably in contact with the government as required by statute, objected to these conclusions. Failure to object to a PSR finding regularly results in waiver of parties' rights. *See, e.g.*, *United States v. Aquino-Florenciani*, 894 F.3d 4, 9 (1st Cir. 2018) (citing cases).

In the midst of the November 15, 2022 sentencing hearing, the government stated for the first time, "[w]e learned last week meeting with the tribe that they incurred close to $200,000 complying with grand jury subpoenas, collecting all the records, reviewing the records, attorneys' fees," and requested a date for further briefing on the issue of restitution. Nov. 15, 2022 Tr. 68-69. Notably, the Tribe was represented for a significant period of time by a prominent and experienced criminal defense attorney who was also a former Assistant United States Attorney who was monitoring the trial, aware of the charges, aware of the verdicts, and aware of the sentencing date, but who never submitted a timely claim for restitution.[1] Even assuming, contrary to the pre-existing invoices itemizing the claimed expenses, that the Tribe's losses were "not ascertainable by the date that is 10 days prior to sentencing," the statute expressly provided that "the attorney for the Government . . . shall so inform the court." § 3664(d)(5). These indisputably missed deadlines are "legally enforceable," even if they do not "deprive the court of the power to order restitution" in the event it chooses to do so. *See Dolan v. United States*, 560 U.S. 605, 611 (2010).

---

[1] That neither the attorney for the Tribe nor the government made a timely and particularized application for restitution implies that the current restitution request was an afterthought.

Here, the missed deadlines are far from a matter of just form. The interests of finality to lengthy and complex district court litigation were anticipated as of the date of sentencing. In other contexts, the government regularly raises finality to contest tardy defense motions. Instead, the belated request for restitution raises numerous complex legal issues, all coming before the Court for the first time at and after sentencing, in a case where the defendant who is intent on exercising his appellate rights to respectfully challenge the many difficult and critical legal decisions that arose during the trial of the case, must now, instead focus on meeting the Tribe's request that he fund its legal expenses when much of the expenses had nothing to do with him or even his company and where none of the expenses have anything to do with his crime of conviction. *See infra* Section F. For these reasons, the defense submits that the Court can and should deny restitution based solely on the government and Tribe's failure to comply with the statute. But assuming *arguendo* the Court disagrees, the request for restitution also fails on the merits for a number of reasons.

**B.      Mr. DeQuattro Was Not Convicted of an Offense "Against Property"**

Restitution under this statute is limited to certain categories of offenses, among them offenses "against property" under Title 18. 18 U.S.C. § 3663A(c)(1)(A)(ii). As the government's own leading authority on this issue states, interpretation of this provision should "start with the rather unremarkable observation that 'against' is not the same as 'relating to' or 'concerning.' The latter two . . . sweep much more broadly, and would encompass offenses with little more than some connection to property." *United States v. Collins*, 854 F.3d 1324, 1331 (11th Cir. 2017) (citation omitted). By contrast, "against" connotes a level of "directedness." *Id.* "Property, therefore, must serve as the object of the offense, not simply a collateral component.

At its simplest, this understanding includes offenses in which the defendant ***intends to damage another's property*** . . . ." *Id.* (emphasis added) (citation omitted).  Indeed, the phrase "against property" has its "roots" in common law, where it "referred to a specific set of criminal conduct," namely "larceny, embezzlement, cheating, cheating by false pretenses, robbery, receiving stolen goods, malicious mischief, forgery, and uttering forged instruments." *Id.* at 1332-33 (citation omitted).

It is "not readily apparent" that bribery "will always trigger" this provision of the statute. *Id.* at 1335.  As one district court has explained, "the elements of" § 666 "do not make it an offense against property." *United States v. Adorno*, 950 F. Supp. 2d 426, 429 (E.D.N.Y. 2013) (distinguishing honest services fraud in violation of 18 U.S.C. § 1346).  According to the government's prior filings in this case, conviction does not require a showing that the recipient's "official conduct" was "influenced." *Id.* at 430; *see also* Dkt. 258 (Govt. Opp'n to Post-Trial Rule 29 Motion) at 21 ("The government was not required to prove that the Bowflex and paid hotel stay caused Cromwell to refrain from doing something he otherwise would have done."). And there was no evidence that any action by Mr. Cromwell was so influenced.  In fact, to the contrary, the trial evidence evinced no indication that termination of RGB's contract was ever considered by anyone at any time and, to the contrary, established that stakeholders in the casino project were, without exception, completely satisfied with RGB's performance. *See, e.g.*, Dkt. 252 at 6-7.  This lack of evidence that Mr. DeQuattro's actions implicated another person or entity's property interest renders the statute relied upon by the government inapplicable. *See Adorno*, 950 F. Supp. 2d at 430; *Collins*, 854 F.3d at 1335 (suggesting that the statute may not apply where the government fails to "demonstrat[e] that any improperly influenced transaction

implicated someone else's property"). The cases cited by the government are all readily distinguishable on this basis. *See Collins*, 854 F.3d at 1335 (noting that defendant withdrew funds belonging to the victim bank); *United States v. Turner*, 718 F.3d 226, 236 (3d Cir. 2013) (involving "conspiracy to defraud the IRS of its *property*," namely tax dollars owed); *United States v. Razzouk*, 984 F.3d 181, 189 (2d Cir. 2020) (involving payments from the victim for which it "received no consideration").

Notwithstanding its own reliance upon *Collins* and its acknowledgement that not all bribery would necessarily trigger the statute, the government misses this issue. In a single sentence, it asserts that Mr. DeQuattro's offense "qualifies as an offense against property because . . . DeQuattro wanted RGB's valuable contract to stay in place (and got it), and Cromwell wanted cash, a Bowflex, and payment for a pricey hotel stay (and got it)." Dkt. 307 at 2. This logic would apply to any and all bribery. Of course, the very definition of a bribe requires that an item of value be offered or provided to one party. But, under authorities like *Collins* and *Adorno*, that alone is not sufficient to render an offense one "against property."

**C.     The Government Has Not Proven that the Tribe Suffered a "Pecuniary Loss"**

In addition to the requirement of an offense against property, the restitution statute contains a separate prerequisite of "an identifiable victim or victims" that "has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). The harm to the victim must moreover be "direct[] and proximate[]." § 3663A(a)(2). The legal expenses claimed as subject to restitution cannot be "subsumed under the term 'pecuniary loss.'" *United States v. Yu Xue*, No. 16-CR-22, 2021 WL 2433857, at *6 (E.D. Pa. June 15, 2021). This is because the statutory language "distinguishes between pecuniary loss and necessary expenses." *Id.* "[E]xpenses for

legal fees and costs incurred during an investigation and prosecution of a defendant would only arise after a victim suffers a pecuniary loss 'as a result of the commission of an offense.'" *Id* (quoting 18 U.S.C. § 3663A(a)(2)).

The government does not so much as mention the requirement of "pecuniary loss." It does, however, set forth two theories as to how the Tribe was victimized. It first attempts to rely upon alleged damage to the Tribe's reputation. Such harm is self-evidently not "pecuniary" in nature. *See* Black's Law Dictionary (8th ed. 2007) (defining "pecuniary" to mean "Of or relating to money; monetary"). Any resulting "distrust in [unidentified] potential lenders," allegedly "impeding the Tribe's ability to obtain financing [in an unspecified amount] for economic development" has not been proven to be a direct or proximate result of Mr. DeQuattro's actions and remains entirely unparticularized. Dkt. 307 at 2. A similar analysis applies to the only other harm cited by the government, namely unenumerated "delays and cost increases" allegedly resulting from the Tribe's decision to terminate RGB's work on a housing project and childcare facility. Dkt. 307 at 3. There is, notably, no indication that RGB was not living up to its obligations under either contract – and of course no suggestion that RGB did not fully and competently discharge its professional responsibilities pursuant to the contract at issue in the trial. The Tribe's decision to terminate its relationship to RGB which was not a party to this case, was entirely its own. Accordingly, any allegation that the Tribe suffered any loss resulting from that decision was not proven to have been directly and proximately caused by Mr. DeQuattro. *See United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004) ("Because the work for which the . . . funds were disbursed was done, it would be an unfair windfall to HUD to

conclude that HUD had directly and proximately suffered a loss . . . .").[2]  There was in short not "pecuniary" loss to the Tribe from Mr. DeQuattro's crime of conviction and thus a statutory imperative for restitution against him is totally lacking.

D.    **The Government Has Not Proven that the Claimed Loss Was the Direct or Proximate Result of Mr. DeQuattro's Offense of Conviction**

The government brief entirely overlooks binding Supreme Court precedent holding that the Court's authority to award restitution is limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990).  Accordingly, "a defendant who is charged with multiple offenses but who is convicted of only one offense" cannot be required "to make restitution for losses related to the other alleged offenses." *Id.* at 412-13; *see also United States v. Mancillas*, 172 F.3d 341, 343 (1st Cir. 1999) (applying *Hughey* to restitution statute at issue here); *United States v. Comer*, 93 F.3d 1271, 1279 (6th Cir. 1996) (vacating restitution award "based on losses occasioned by conduct that was not charged in the indictment and losses that resulted from a charge of which the defendant was acquitted").  While the permissible basis for restitution may be somewhat broader "[w]hen the offense of conviction involves as an element a scheme, conspiracy, or pattern of criminal activity," that is not the case here.  *United States v. Lisa*, 152 F. App'x 85, 87 (2d Cir. 2005) (unpublished) (citation omitted).  Mr. DeQuattro was acquitted of conspiracy, acquitted of all the political donation allegations, and convicted of a single count of substantive bribery in connection with two standalone gifts to Mr. Cromwell: a used Bowflex machine and a hotel reservation.  The government was therefore required to prove that the claimed loss "would not

---

[2] In fact, the Tribe and RGB reached a settlement agreement, releasing each other of liability arising from these two projects.

have occurred but for" Mr. DeQuattro's provision of those two gifts and that "the loss is not too attenuated (either factually or temporally)" from those gifts. *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002) (citation omitted).

The government brief reflects no attempt whatsoever to tie the claimed losses to the specific conduct underlying Mr. DeQuattro's single count of conviction. That striking omission alone is fatal to the restitution claim. *See, e.g.*, *United States v. Chan*, No. 16-CR-10268, 2019 WL 3975579, at *8 (D. Mass. Aug. 22, 2019) ("Under the MVRA, the government has the burden of seeking and establishing a claim for restitution.").

### E. The Claimed Legal Fees and Expenses Are Not "Other Expenses" Reimbursable Under the Applicable Subsection

The nature of the expenses claimed, namely legal fees and expenses, are also outside the scope of the relevant subsection of the restitution statute. The government categorically asserts that the covered "expenses include legal fees," Dkt. 307 at 3, but the sole authority cited in support of that proposition merely "assume[d] without deciding" that issue, which was not raised in the case at hand. *In re Akebia Therapeutics, Inc.*, 981 F.3d 32, 38 n.4 (1st Cir. 2020). The First Circuit has previously stated that "attorney's fees" will "[f]requently . . . not be recoverable" in the context of restitution. *United States v. Corey*, 77 F. App'x 7, 11 (1st Cir. 2003) (unpublished). Here, the government seeks to recover the legal fees and expenses under the statutory subsection permitting reimbursement "for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).

The Supreme Court recently had occasion to construe this same subsection. *See Lagos v.*

*United States*, 138 S. Ct. 1684 (2018).  The issue in *Lagos* was whether the statutory terms "investigation" and "proceedings" "are limited to government investigations and criminal proceedings, or whether they include private investigations and civil proceedings." *Id.* at 1687.  The Court ultimately adopted the former, narrower reading.  In reaching this result, the Court observed that the subsection "lists three specific items that must be reimbursed, namely, lost income, child care, and transportation; and it then adds the words, 'and other expenses.'  Lost income, child care expenses, and transportation expenses are precisely the kind of expenses that a victim would be likely to incur when he or she (or, for a corporate victim . . . , its employees) misses work and travels to talk to government investigators, to participate in a government criminal investigation, or to testify before a grand jury or attend a criminal trial.  At the same time, ***the statute says nothing about*** the kinds of expenses a victim would often incur when private investigations, or, say, bankruptcy proceedings are at issue, namely, ***the costs of hiring private investigators, attorneys, or accountants***."  *Id.* at 1688 (emphasis added) (citation omitted).  Thus, applying the *noscitur a sociis* canon of statutory construction, meaning "that statutory words are often known by the company they keep," the Court found "both the presence of company that suggests limitation and the absence of company that suggests breadth."  *Id.* at 1688-89.  *Lagos* also noted that a "broad reading" of the statute "would create significant administrative burdens."  *Id.* at 1689.  The recoverable expenses must be "*necessary*," and application of the statute to private investigations would "invite disputes" regarding the necessity of particular expenses which "may become burdensome in cases involving multimillion dollar investigation expenses for teams of lawyers and accountants."  *Id.*  "[O]ne begins to doubt whether Congress intended, in making this restitution mandatory, to require courts to resolve

these potentially time-consuming controversies as part of criminal sentencing . . . ." *Id.*

Both the legal and pragmatic aspects of *Lagos*'s rationale are equally applicable to the issue presented here: whether "other expenses" may include legal fees and related costs incurred during a government investigation and prosecution. The Fifth Circuit recently applied *Lagos* to find that "other expenses" did not include costs of a victim assisting the FBI in investigating an alleged hacker. In reaching this result, the court observed, "[i]t would be rather strange for the specific items in a list to be the kind of expenses that a victim would be likely to incur when he or she . . . misses work, but then for the catchall phrase of the same list to mandate restitution for digital forensic services. Think about it: The costs of a babysitter, a tank of gas, a parking meter–and a 44-person digital security team." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) (citation omitted). The combination is similarly unsupportable when one replaces "44-person digital security team" with $240,000 in legal fees and expenses. "One of these things is not like the others." *Id.* The Fifth Circuit relied on the same canon of construction cited in *Lagos*: *noscitur a sociis*. *See id.* at 307. Indeed, the Supreme Court recently held that the statutory word "expenses" did not include attorney's fees when read "alongside neighboring words" in an unrelated statute. *Id.* (citing *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019)). The Fifth Circuit additionally cited the cannon of *ejusdem generis*, which "limits general terms which follow specific ones to matters similar to those specified." *Id.* at 308 (citation omitted). Following that canon here, "restitution is required for 'lost income and necessary child care, transportation, and other [similar] expenses.'" *Id.* In short, "[t]ext and context both counsel against . . . expansive interpretation of 'other expenses'" that would include legal fees like those at issue here. *Id.* at 309. As *Lagos* itself recognized, the statute "says

10

nothing about . . . the costs of hiring private investigators, attorneys, or accountants." 138 S. Ct. at 1688.

Moreover, reading "other expenses" to include hundreds of thousands of dollars "for teams of lawyers" would lead to the very same "burdensome" disputes that the *Lagos* Court sought to avoid. *Id.* at 1689. This matter provides a case-in-point. As set forth below, it is far from clear that several significant line items from the submitted legal invoices were "necessary" to the Tribe's participation in the government's investigation and prosecution of Mr. DeQuattro. To hold that such expenses, as a class, may be "other expenses" (notwithstanding their lack of similarity to the other specific types of expenses expressly mentioned in the same subsection) would inevitably require courts to wade into an intricate analysis of necessity at many criminal sentencings. Here, however, for reasons set forth below, the Court may alternatively conclude that the government has failed to satisfy its burden of establishing the necessity of the expenses in many respects.

**F.     The Government Has Not Proven that the Claimed Expenses Were "Necessary" to the Tribe's Participation in the Investigation or Prosecution of Mr. DeQuattro's Offense of Conviction**

The First Circuit has described *Lagos* as "sharpen[ing] . . . focus on an important qualifier within the language of the statute: only <u>necessary</u> expenses are mandated for reimbursement." *Akebia*, 981 F.3d at 37 (emphasis in original). This statutory word requires that the claimed expenses be "integral to [the victim's] participation in the government's investigation and prosecution of the offenses." *Id.* The government here develops no argument, and indeed does not even make an assertion, that all of the claimed expenses were necessary. And there is substantial reason to doubt whether they were.

11

Attached to the declaration executed by the Tribe's attorney are 100 pages of legal bills, submitted for the first time weeks after sentencing. The government brief contains no detailed analysis of the various line items, instead simply asserting that all amounts due were incurred to "(a) review and produce records responsive to grand jury subpoenas; (b) provide legal representation to Tribal members who were interviewed by the government and/or testified before the grand jury or at trial; and (c) have a legal representative monitor its interests by attending hearings and the trial." Dkt. 307 at 4.

1. *Lack of proof connecting claimed expenses for subpoena response to Mr. DeQuattro's offense of conviction*

The temporal and factual context of the subpoenas undercuts any suggestion that the vast majority of the expenses incurred in response were directly and proximately caused by Mr. DeQuattro's conduct underlying his conviction. The government served four subpoenas on the Tribe between June 5 and October 28, 2020. *See* C. Wichers Decl. ¶ 6. The first subpoena, by the government's own account, "did not request any records relating to RGB." Dkt. 307 at 5 n.1. There is no indication that that subpoena was related in any respect to Mr. DeQuattro's conduct, and the $68,000 allegedly spent by the Tribe in responding to it therefore cannot be attributed to him.

The government represents that the second subpoena, served August 10, 2020, did request certain unspecified records regarding RGB, in addition to other materials. The defense notes that the government has not submitted the subpoenas in support of its request for restitution and declined to produce the subpoenas or seek Rule 6(e) authorization to disclose the subpoenas in response to specific request to disclose those subpoenas to the defendant in preparation for this filing (instead providing a generalized statement of which subpoenas related in whole or part to

12

RGB).  The government's omission on this point alone dooms its restitution claim due to an utter lack of evidence that extra time was billed for any RGB-related request.  In fact, the supporting invoices do not even mention RGB until September 8, 2020, the date that the third subpoena, which the government represents related specifically to RGB, issued.  Moreover, as set forth above, Mr. DeQuattro's acquittals in connection with all payments made to Cromwell preclude him from being jointly and severally liable for any expenses to the Tribe arising from such payments.  The government provides no information whatsoever regarding to what degree any of the subpoenas related to the conduct underlying Mr. DeQuattro's conviction, namely the Bowflex and the hotel reservation.  It seems far more likely that the subpoenas would have issued irrespective of these largely *de minimis* gifts because they were motivated primarily, if not entirely, by the payments for which Mr. DeQuattro was acquitted, and even more, the conduct of Mr. Cromwell having nothing to do at all with Mr. DeQuattro.  Thus, the government has not proven that Bowflex and hotel suite were a but-for or proximate cause of the claimed expenses.  The government's failure to provide the four grand jury subpoenas has diminished Mr. DeQuattro's ability to distance his offense of conviction from the goals of the subpoenas.  Likewise, the unparticularized legal bills have prevented any meaningful ability to apply a time charge to legal work relating to the conviction.  The burden is on the government, which should have sought Rule 6(e) permission to disclose rather than opposing the defense request.  Similarly, given the caselaw, the government should have required a more particularized showing of why legal billings were applicable to each of the defendants.

Indeed, Mr. DeQuattro was not even informed that he was a target of the investigation until September 4, 2020, after two of the four subpoenas had already issued (and just four days

prior to issuance of the third) and thousands of dollars in claimed expenses had already been incurred. It was not until the day the fourth and final subpoena issued, October 28, 2020, that Mr. DeQuattro's former business partner Joseph Beretta met with the government and incriminated him in the suspected crimes. The government also represents that the fourth subpoena was for Mr. Cromwell's email account records and other records relating to Mr. Cromwell. This subpoena would almost certainly have issued irrespective of Mr. DeQuattro's gifts of a Bowflex and hotel reservation thus all fees attributable to this fourth subpoena should be completely inapplicable to Mr. DeQuattro.

   The foregoing makes clear that the government's investigation began with a focus on the Tribe and Mr. Cromwell, with no focus whatsoever on Mr. DeQuattro. Even after the government began focusing on Mr. DeQuattro, its primary (if not sole) interest appears to have been in payments he made to Mr. Cromwell, for which he was subsequently acquitted. These circumstances demand a far more detailed accounting of expenses than the government or the Tribe has thus far provided to ensure that the amounts claimed were the direct and proximate result of Mr. DeQuattro's offense of conviction. Mr. DeQuattro cannot be held responsible for reimbursing costs incurred in the government's unrelated investigation of Mr. Cromwell or other parties, or its investigation of conduct by Mr. DeQuattro that the jury determined to be non-criminal. The descriptions in the invoices produced in support of the restitution request utterly fail to differentiate between (a) Mr. DeQuattro's offense of conviction, (b) his acquitted conduct, and (c) investigations relating to Mr. Cromwell and others. Neither the invoices themselves nor the government's description of the expenses even mentions the Bowflex or the hotel reservation. The only mention of Mr. DeQuattro in the supporting documents is for 30 minutes

of time spent reviewing and communicating about his motion to dismiss (which was not, in any respect, necessary to the Tribe's participation in the prosecution). Further delay in complying with the statutory requirements should not be countenanced and the unparticularized appending of 100 pages of legal bills should be determined to not meet the government's burden as to Mr. DeQuattro.

> 2. *Lack of proof that certain expense items were necessary to any subpoena response at all*

Various invoice line items appear to have been unnecessary to the Tribe's participation in any government investigation. Some, for example, reflect research and analysis of sovereign immunity issues, presumably in an effort to *resist*, not comply with, the subpoenas. *See* R. Salguero Decl., Ex. A at 8/13/20-8/18/20 (reflecting 13.8 attorney hours with entries relating, at least in part, to sovereign immunity issues). Due to block-billing of multiple tasks in single time entries, it is impossible to determine precisely how much of that time was spent on sovereign immunity issues. *See Chan*, 2019 WL 3975579, at *7 n.8 (excluding entries due to block-billing). A similar analysis applies to document review for attorney-client privilege and related research. While the Tribe was certainly within its rights to consider asserting all lawful privileges available to it, doing so was not "necessary" to its participation in the government investigation nor did it relate in any way to Mr. DeQuattro. Other line items reflect key term document searches, presumably in a voluntary effort on the part of the Tribe and its counsel to develop an internal understanding of relevant events. *See id.* at 9/1/20-9/10/20 (reflecting 15.6 attorney hours with entries relating in part to key term searches). Again, these expenses were not "necessary" in the strict sense required by the caselaw.

3. *Lack of proof that Tribe's payment of a witness's legal fees was a "necessary" expense*

Almost $14,000 in claimed expenses relates to legal invoices for representation of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ R. Salguero Decl. ¶ 11. A declaration executed by an attorney for the Tribe represents that it paid all such invoices in full, but it provides no indication that the Tribe was legally required to do so. *See id.* The government has submitted no evidence of any indemnification obligations between the Tribe and members of the Gaming Authority. The invoices are, on their face, addressed to the tribal member individually. *See* R. Salguero Decl., Ex. C. Equally problematic, the descriptions included in the tribal member's legal bills contain no reference whatsoever to subject matter. Instead, they consist exclusively of generic references to items such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* This makes it impossible to determine whether any individual entry was, in fact, necessary to the government's investigation. Although counsel understand the need to protect work product and the professionalism of Mr. ▮▮▮▮▮▮▮ retained counsel, the generic method of billing fails to satisfy the government's burden to prove that Mr. DeQuattro is liable for Mr. ▮▮▮▮▮▮▮ legal bills.

4. *First Circuit precedent undermines the necessity of attorney attendance at trial and witness preparation*

The government also, despite citing *Akebia* for another reason, neglects to mention that the First Circuit in that case affirmed an order excluding from restitution two of the exact same types of legal expenses at issue here, namely "attorneys' time accrued for their attendance at the criminal proceedings" and "time spent making . . . witnesses available" to the DOJ for trial

preparation. 981 F.3d at 38-39.  On the former issue, the district court in *Akebia* persuasively reasoned, "while many individual victims would greatly appreciate having an attorney watch and report on all proceedings relating to the crime, the mandatory restitution scheme supports no such fee shifting provision for individual or corporate victims.  The court finds such a luxury unworkable and unjust in a mandatory restitution scheme.  Indeed, such a statutory construction would create a bizarre incentive where defendants could not afford to go to trial and would need to minimize the moments they appear in court or the documents they file on the public docket, knowing that they could be charged at sentencing with legal fees for every moment of court time." *Chan*, 2019 WL 3975579, at *8.  On the second point, the First Circuit affirmed the district judge's conclusion that "the government prosecutors were responsible for preparing . . . witnesses for trial testimony."  *Akebia*, 981 F.3d at 38-39.  The defense respectfully submits that this Court should follow Judge Talwani in excluding the foregoing expenses from any restitution calculation.

> 5. *Lack of proof that other post-indictment expense items were necessary to the Tribe's participation in the government prosecution*

Other miscellaneous post-indictment line items reflect tasks such as drafting press releases and discussions of unspecified "strategy" following the indictment.  *See* R. Salguero Decl., Ex. A at 11/13/20-11/19/20 (reflecting 9.2 hours of attorney time devoted, at least in part, to such matters).  There has been no showing that such efforts were "necessary" to the Tribe's participation in this case.  Some other line items were clearly outside the scope of assisting the government's prosecution.  For example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ was in no way necessary to that end.  *Id.* at 11/16/20.  Perhaps most glaringly, Mr. DeQuattro should not be responsible for reimbursing the Tribe for its counsel's ▇▇▇▇▇▇▇▇

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ to the prosecutors after the verdict.  R. Salguero Decl., Ex. B at 5/5/22.  And counsel's ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ is facially outside the scope of the reimbursement provision.  *Id.* at 5/6/22.  The inclusion of the foregoing expenses in the government's restitution request makes clear that, weeks after sentencing, the invoices have not yet been subject to the type of detailed review required to ensure the necessity of each line item.

### G.    Even if the Court Orders Restitution, It Should Be Apportioned Based on Culpability

Finally, to the extent that, contrary to the foregoing arguments, the Court concludes that some restitution Order against Mr. DeQuattro is appropriate, it should reject the government's invitation to impose joint and several liability.  As the government brief acknowledges, this Court has the discretion, though not an obligation, to apportion restitution "according to culpability."  Dkt. 307 at 4.  The Court has already observed that this case is "not in the slightest" one involving "[e]qual culpability" among defendants.  Nov. 15, 2022 Tr. 109.  The defense respectfully submits that, for this reason, apportionment based on culpability is appropriate.  *See Chan*, 2019 WL 3975579, at *9 (imposing 90% and 10% apportionment among two defendants where "it was [the former defendant's] actions that drove the expenses . . . incurred").

                                                        Respectfully Submitted,
                                                        DAVID DEQUATTRO
                                                        By His Attorneys,

                                                        **/s/ Martin G. Weinberg**
                                                        Martin G. Weinberg, Esq.
                                                        Mass. Bar No. 519480
                                                        20 Park Plaza, Suite 1000
                                                        Boston, MA 02116
                                                        (617) 227-3700
                                                        owlmgw@att.net

**/s/ Michael Pabian**
Michael Pabian, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

Dated: December 12, 2022

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, December 12, 2022, a copy of the foregoing document has been served via email.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
